

## UNITED STATES DISTRICT C OURT – EASTERN DISTRICT

Nona Farrar

**FILED**

SEP/2 7 2013

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

vs.

**13    5683**

John T. McNesby, Philadelphia FOP Lodge #5, Maureen Faulkner            JURY TRIAL
(see additional defendants attached )

### Jurisdiction and Venue

Jurisdiction exist under 18 U.S.C. 1961-1968, 1965 (a), (b), 28 U.S.C. 1331,1332, 42 USC
1981, 42 U.S.C. 1985 (3), 1st, 5th, 13th Amendment, 1986, 18 U.S. C. 1962 c and d, 28 U.S.C. 1391,
28 USC 1367, Bivens, Respondeat Superior, Philadelphia's long arm statute.

1.Plaintiff is a displaced resident of Chicago who produces events/projects through her Special Events
Planning Company in various cities including the jurisdiction this court sits. Plaintiff's address is P.O.
Box 5015 Chicago, Il 60680 (Plaintiff is requesting an ECF account for email filings of all documents )

2. Defendant John T. McNesby is the President and spokesperson for the Philadelphia FOP Lodge.#5.
Based on information and belief McNesby is a resident of Philadelphia. The secretary for the FOP
Lodge #5 will accept service at **11630 Caroline Road, Philadelphia, PA 19154-2110**. McNesby's
participation in the violations alleged herein reached the jurisdiction this court sits. There is no one
district where the court would have personal jurisdiction over all the racketeers/conspirators.

1

3. Defendant Delta Air Lines, Inc. is a Delaware corporation routinely doing business in Philadelphia, PA. Delta is headquartered at 1030 Delta Blvd Atlanta, GA. Delta provides air transportation in and out of Philadelphia, PA and various other cities in PA and throughout the United States. Their **Registered Agent is Corporation Service Company located at 2595 Interstate Drive #103, Harrisburg, PA 17110**. The wrongs alleged herein reached the jurisdiction this court sits. There is no one district where the court would have personal jurisdiction over all the racketeers/conspirators.

4. Defendant U.S. Airways, Inc. is a Delaware corporation routinely doing business in Philadelphia, PA. U.S. Airways headquarters are located at 111 W. Rio Salado Parkway, Tempe, AZ 85281. Their **registered office is located at 1515 Market Street #1210, Philadelphia, PA. 19102**. U.S. Airways provides air transportation throughout the U.S. The alleged wrongs reached the jurisdiction this court sits. There is no one district where the court would have personal jurisdiction over all the racketeers/conspirators.

5. Defendant Hilton Worldwide, Inc. is a Delaware Corporation routinely doing business in Philadelphia, PA and throughout the United States. Hiltons' corporate office is located at 7930 Jones Branch Dr #1100 McLean, VA. **Their registered agent is United States Corp Co, located at 2595 Interstate Drive - #103, Harrisburg, PA 17110**. Hilton provides guest housing to the public in Philadelphia, PA and the U.S. nationally. The alleged wrongs herein reached the jurisdiction this court sits. There is no one district where the court would have personal jurisdiction over all of the racketeers/conspirators.

2

6. Defendant Chuck Canterbury is the President of the National Fraternal Order of Police who based on information and belief resides in Myrtle Beach, FL. but also conducts a lot of business in the jurisdiction this court sits. The wrongs alleged herein reached the jurisdiction this court sits. There is no one district where the court would have personal jurisdiction over all of the racketeers. **The FOP Legal Counsel has agreed to accept service for him located at, Attorney Larry James  500 South Front Street, Suite 1200, Columbus, OH  43215**

7. Defendant Maureen Faulkner based on information and belief resides at **1629 Shadow Oaks, Thousand Oaks, CA  91362.** She is the widow of Officer Faulkner and a board member of the Justice for Danny Faulkner organization.  Faulkner does lots of business in Philadelphia, PA with her foundation and with the FOP. The wrongs alleged herein reached the jurisdiction this court sits There is no one district where the court would have personal jurisdiction over all of the racketeers/conspirators.

8. Defendant David Gersh, based on information and belief resides at **1445 E. Los Angeles Avenue Suite 301D in Simi Valley, CA  93065.** Gersh does business with business owners from various states. The wrongs alleged herein reached the jurisdiction this court sits. There is no other district where the court would have personal jurisdiction over all of the racketeers/conspirators.

9. Defendant Sephria Shuttlesworth is a resides at **1142 Edwards Lake Road, Birmingham, AL  35235.** The wrongs alleged herein reached the jurisdiction this court sits. There is no one district where the court would have personal jurisdiction over all the racketeers/conspirators.

10. Defendant Pat Massengill resides at **789 Mayjo Court in Cincinnati, OH 45224 – 1753**. The wrongs alleged herein reached the jurisdiction this court sits. The alleged violations reached the jurisdiction this court sits. There is no one district that would have personal jurisdiction over all the racketeers and or conspirators.                3

11. Unidentified defendant U.S. Airways Does, Delta Airlines Does, Hilton Garden Inn Doe, Birmingham Holiday Inn Airport Doe, TSA Doe identities are currently unknown to Plaintiff. Plaintiff sought their identities and contact information for service prior to filing this civil suit but, their employers refused to provide it. Plaintiff will seek their identities via a motion to the court and request amending the complaint. **Plaintiff will serve them at their place of business through their employer for now.**

12. Defendant Holiday Inn Birmingham, AL Airport based on information and belief is incorporated in Birmingham, AL Their physical address is **5000 Richard Arrington Jr. Blvd, Birmingham Al 35212** The allegations alleged herein reached the jurisdiction this court sits. There is no one judicial district that would have personal jurisdiction over all the racketeers and or conspirators.

13. Defendant Philadelphia FOP Lodge #5 is an unincorporated association in Philadelphia. It's headquarters are located at **11630 Caroline Road, Philadelphia, PA 19154-2110**. The violations alleged herein reached the jurisdiction this court sits. There is no one judicial district that would have personal jurisdiction over all the defendants.

14. Defendant Fraternal Order of Police ( National Fraternal Order of Police ) is incorporated in Philadelphia with a registered office located at **2949 North Front Street, Philadelphia, PA 17110**. Its' headquarters are located at 701 Marriott Dr. Nashville, TN 37214. They do business nationally through their local lodges. The violations alleged herein reached the jurisdiction this court sits. There is no one judicial district that would have personal jurisdiction over all the defendant.

15. Defendant Eric H. Holder is the Attorney General of the United States and is being sued in his individual capacity. Based on information and belief he resides in Washington, DC and will served at the **DOJ – 950 Pennsylvania Avenue, NW Washington, DC 20530 – 0001.**

4

BACKGROUND

16. Defendants conspired to participate directly and or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering affecting interstate commerce. McNesby, Faulkner and Canterbury sponsored, coordinated, supervised, directed, authorized and funded a racketeering campaign to force plaintiff to go a different route with her business and to deter plaintiff from suing the defendants absent the racketeering causing plaintiff to fear physical and economic harm. The Philadelphia FOP Lodge #5, McNesby, the Alabama State FOP Lodge and defendant Faulkner spearheaded a nationwide anti- Mumia campaign that is co-sponsored by defendant Canterbury and the National FOP.

17. They used 2 very secret weapons to assist in furthering the racketeering campaign, defendant participants Shuttlesworth and ( non-party ) Unknown FBI Agents. The defendants and the ( non-party ) participating racketeers feared plaintiff would use her business, profits and contacts to benefit Mumia Abu Jamal because plaintiff is a supporter and had planned to donate to his legal defense at any point from one of her events/projects allowed her to do so. Plaintiff's events were high profile events that would have allowed plaintiff to do so from her profits.

18. The defendants directly and or indirectly through their co-racketeer ( non-parties ) that they recruited within their FOP union membership, other supporting union members ( fire, federal and state law enforcers ) and private individuals nationwide, conspired to participate in carrying out the criminal and violent acts by **employing extortion, attempted extortion, wire fraud, bank fraud, identity theft, violent acts and conspired to travel and or use facilities in interstate commerce to use the wires illegally to obtain, disseminate and otherwise share the property they illegally obtained/stole from plaintiff.**

5

19. The defendants were demonstrating their strength in numbers, seeking to increase memberships, continue to breed the code of silence among the co-racketeering participants, cover-up the racketeering conspiracy to try to make plaintiff go in a different direction with her business to cause fear of physical and economic harm. To top all that off, they were attempting intimidate plaintiff from filing this suit and being about to pursue it absent the racketeering. The defendants directly and or indirectly through their (non-party) co-racketeers were illegally obtaining/steeling plaintiff's confidential personal and business information by employing the racketeering acts to use plaintiff's property to their advantage and plaintiff's disadvantage.

20. In to all of that, in late 2012 via a FOIA request plaintiff filed she learned that the FBI had been maintaining records on Rev. Shuttlesworth during plaintiff's association with him ( from 2006 – 2011 ) and in 5/13via a FOIA request plaintiff filed the FBI turned over records which indicate " investigation continues" as it relates to the time and effort they spent/spend on plaintiff.

21. The ( non-party ) participating Unknown FBI Agents had attempted to cover-up having the records previously on plaintiff in 7/11. The FBI maintains they've turned over all documents on plaintiff. No records were produced indicating their "continued investigation" from 2003 has come to a halt. Plaintiff was at defendants Shuttlesworth's home in 7/11.

22. There was not one shred of evidence of any criminal activity involving plaintiff and the crime in question. The white male involved in the murder of the federal judge's family killed himself prior to being caught. It was a national investigation. Plaintiff had appeared before the judge about 8 years prior on a civil matter. JTTF/FBI contacted plaintiff saying they had a subpoena to speak with her Plaintiff told them to send it to a lawyer on her behalf. They never sent the subpoena so, no matter how many times they called or stopped by plaintiff's job, plaintiff would not speak with them absent the subpoena. Plaintiff knew they'd need probable cause to obtain a subpoena and they had none.

23. Continuing an investigation on plaintiff was being done for no legitimate law enforcement purpose. It was plaintiff's first amendment activity and her associations that the defendants and (non-party) co-racketeers had an issue with.

24. Plaintiff believes that discovery will show **a pattern over the past 10 years** of the defendants and their (non-party ) co-racketeers involved in a very extensive state to state covert racketeering effort to obtain plaintiff's property and otherwise damage plaintiff in her business and legal property interest for their own personal gain which includes but is not limited to contracts, potential contracts, prospective economic advantages with sponsors such as tv stations, radio stations, print media partners, chambers of commerce, hotels venues, personalities, entertainers and other high profile individuals for plaintiff's events and or projects and other third parties. They defendants directly and or indirectly also obtained and or attempted to obtain plaintiff's legal property interest to pursue to file this suit and pursue it absent the racketeering which included causing plaintiff to be in physical and economic fear.

25. From 11/12/09 to present defendants Faulkner, McNesby and Canterbury sponsored, coordinated, supervised ,directed, authorized, funded and directly and or indirectly gave the order for the criminal elements to employ the criminal and violent acts that were carried out against plaintiff. Faulkner is the Gotti figure, McNesby handles funding via his members and other supporting union members and outsiders and Canterbury was responsible for rallying the troops nationally to carry out the racketeering scheme. Faulkner, McNesby and Canterbury are very active participants in the racketeering.

7

26. Plaintiff didn't know until her stay from 6/11 – 10/11 at defendant Shuttlesworth's home
that she was involved in the racketeering and other unlawful acts against plaintiff. Like the FOP
defendants and the unknown FBI participants, defendant Shuttlesworth participated directly and or
indirectly in employing and or causing to be employed criminal and violent acts against plaintiff
because she wanted to make sure that Rev. Shuttlesworth was never tied to plaintiff publicly nor her
events/projects. Not only were defendant Shuttlesworth and plaintiff were close friends ( so plaintiff
thought ), they were also business partners.

27. The defendants and their co-racketeers ( non-parties ) had an extreme fear of Rev. Shuttlesworth
being associated and or involved with plaintiff , her projects/events and or associations and utilized all
their expertise and resources to make sure there was never a successful connection to her business
ventures Rev. Shuttlesworth was happy to be associated with.

28. McNesby, Canterbury and Faulkner have authorized the criminal elements infesting the FOP
 unions to carry out the racketeering through a reign of terror and fear while maintaining the omerta
( the code of silence) about doing so and otherwise covering it up. This allows them to demonstrate
their strength in numbers, continue to breed the code of silence and violate the most vulnerable
(plaintiff ) . The FOP union participating (non-party) co-racketeers and those they get to join them in
the racketeering conspiracy have a known reputation for racketeering and the omerta ( the code of
silence).

29. Faulkner is the voice and face of the fallen officers widows but, out of all the law enforcement
officers widows, Faulkner is the only one that has aligned herself with the FOP defendants despite her
knowledge of the history of racketeering and code of silence ( the omerta ) within and without the FOP
and supporting unions whose unlawful acts against plaintiff she, McNesby and Canterbury sponsored,
coordinated, supervised ,directed, authorized, funded

8

## THE ENTERPRISE – ASSOCIATE IN FACT

Faulkner, McNesby, Canterbury, Shuttlesworth, Gersh, Unidentified TSA Defendant Doe
and ( non – party ) co-racketeers Unknown FBI Agents, Unknown FOP Members and Unknown
Other Supporting Union Members and Unknown Private individuals

30. From 11/12/09 to present defendants and the (non party ) co-racketeers constitute an enterprise
within the meaning of the act. They are a group of individuals "associated in fact", ( The anti-Mumia
racketeering crew ). They are each persons within the meaning of the act who associate and participate
in the affairs of the enterprise.

31. The common goal of the enterprise is to try to make plaintiff go in a different direction with her
business and if not it will be shut down, and to attempt to stop plaintiff from being able to file this
complaint and be able to pursue them in court absent the racketeering by illegally obtaining plaintiff's
property through a pattern of racketeering to use to their advantage. The defendants conspired to
associate/participate in the conduct of the affairs of the enterprise through a pattern of racketeering
which included **extortion, attempted extortion, wire fraud, bank fraud, identity theft and very
violent and degrading acts**. The defendants conspired to adopt the goal of the conspiracy, to further
and facilitate the goal which if completed would make up all the elements for the Hobbs Act offenses.

32. The legitimate purpose of the Enterprise is to support First Responders in the work they do for the community. **The illegitimate** common purpose of the enterprise is to conspire is to try to make plaintiff go in a different direction with her business otherwise they will shut it down and to attempt to stop plaintiff from being able to file this complaint and pursue them in court absent the racketeering. Plaintiff was always their target but, defendants McNesby, Faulkner, Canterbury directly and or indirectly through their (non-party ) co-racketeers have a history of doing business in this manner. Plaintiff isn't the first victim. Others have fallen victim to their fear tactics and or for one reason or another didn't pursue them legally.

## HOBBS ACT

Faulkner, McNesby, Canterbury, Shuttlesworth, Gersh, Unidentified TSA defendant doe and ( non-party co-racketeers ) Unknown FBI Agents, Unknown FOP Members and Unknown Other Supporting Union and Private individual co-racketeers

33. From 11/12/09 to present Faulkner, Canterbury and McNesby with their co-defendants and (non-party) co-racketeers devised a **WIRE FRAUD** scheme to defraud plaintiff, the owners that host and maintain the sites that required plainiff's confidential passwords and logins ( banks, business account websites, yahoo etc. ) and the public through use of the wires in furtherance of the scheme to directly and or indirectly through their co-racketeers, obtain plaintiff's property ( computer login, email login passwords, business contacts' information, data of the communications ) from her computer, email account and business accounts, under false pretenses and use them to their advantage. Defendant Shuttlesworth blamed plaintiff for the problems she was having with her events/projects.

10

34. Plaintiff paid a Dallas, TX company to send out a press release to their media sources for the MLK Assassination Trial audiobook to run 4/3/12. The media sources were located in various states including the state this court sits. The press release company submitted it to 53 of their media sources Entertainment pages. The defendants directly and or indirectly through their (non-party) co-racketeers obtained or caused to be obtained, plaintiff's property and her legal property interest ( password, login to upload the press release, her right to contract with third parties and make a living and profit in her business absent the racketeering ) and also obtained the press release from where it was placed, took it and placed it where they wanted it which was on the Stock, Banking, and Financial pages in 51 out of the 53 different Media Sources for their own benefit.

35. From 11/12/09 to present defendants Faulkner, McNesby and Canterbury with their co-defendants and (non party ) co-racketeers devised an **INDENTITY THEFT** scheme to defraud plaintiff, the owners that host and maintain the sites that required confidential passwords and logins ( banks, business account websites, yahoo business email etc. ) and the public to directly and or indirectly through their (non-party) co-racketeers transfer, possess and or use or caused to be transferred, possessed and or used, plaintiff's identity to obtain her confidential business property ( computer login, email login, passwords, business contacts information, data of business communications, airline tickets etc. )

36. Plaintiff's MLK Assassination Trial audiobook features two of the targets of defendants McNesby, Faulkner , Canterbury and (non-party ) co-racketeers anti Mumia racketeering campaign. High profile Spoken Word talents Maya Angelou and Nikki Giovanni. Their recordings/books/events are highly sought after by libraries and the public. They were both personal friends of Dr. King and were happy to be a part of plaintiff's audiobook but, the defendants decided that they wouldn't allow plaintiff to market the audiobook absent their racketeering.

11

37. From 11/12/09 to present Defendants Faulkner, McNesby and Canterbury conspired with their co-defendants and the co-racketeer ( non-parties ) to illegally directly and or indirectly **EXTORT and ATTEMPT EXTORTION** by unlawfully obtaining plaintiff's property (confidential business information, passwords, logins, data communications, business contacts information etc.) that plaintiff has a legal property interest. The purpose of passwords and logins are to maintain confidentially from uninvited silent partners that force themselves in/ racketeers.

38. Defendants Faulkner, McNesby and Canterbury, their co-defendants and (non-party ) co-racketeers knew plaintiff had no choice but to allow them to illegally obtain her property they also knew they had no legal right to her property nor any property she had a legal property interest in. Faulkner, McNesby and Canterbury directly and or indirectly used or caused to be used plaintiff's illegally obtained property to their benefit and to plaintiff's disadvantage.

39. The defendants directly and or indirectly through their co-racketeers had placed plaintiff in fear of physical and economic harm and they took advantage of that. Plaintiff's confidential business information was not their business but, they forced themselves in and took it and used it.

40. From 11/12/09 to present defendants Faulkner, McNesby and Canterbury with their co- defendants and (non party ) co-racketeers directly and or indirectly devised a scheme of Extortion/ Attempted Extortion/Wire Fraud/ Identity Theft to illegally obtain and or caused to be illegally obtained plaintiff's property (1) confidential business information, (2) her legal property interest to make a living and profit through her Special Events Planning company absent the racketeering (3) her right to hold all racketeers accountable in court absent the racketeering. They traveled and or used facilities in interstate commerce to further/facilitate the racketeering conspiracy with plaintiff's unlawfully obtained property in violation of the **TRAVEL ACT**. Defendants disseminated/shared/used plaintiff's property and what she has a legal property interest in via the wires ( radios, phones, internet etc ).

12

41. In June 2011 plaintiff prepared to go to defendant Shuttlesworth's home for a 3 month stay. Before leaving plaintiff ordered by phone a directory titled "Who's Who in Cleveland" so that she could produce and market her Musical Tribute to MLK ( a tour ) concert while at Shuttlesworth's home. Plaintiff was producing the concert to shop it to PBS for their fund drives. Plaintiff would also be working on pre-production of the Troy Davis audiobook so she could get money for housing.

42. Plaintiff had a venue sponsor, mall partners and media involved in the concert that would start in Cleveland. The tour would involve choirs from various states on different dates including the jurisdiction this court sits.

43. The concert had been rescheduled a couple times in 2011 due to the financial ruin the racketeering had caused but a 2/2012 date ended up being the last date it was scheduled for. A well known choir was scheduled to perform at the Cleveland show and sell tickets at their church. The founding minister of the church of the performing choir in Cleveland was very involved in the Civil Rights Movement and was very good friends with Rev. Shuttlesworth. The founding minister would also be preaching Rev. Shuttlesworth's funeral so, the least little problem with plaintiff and the Shuttlesworth crew would mean disaster and the defendants knew that so, they set out to put a disaster in action.

44. On 3/18/11 a male from federal express called plaintiff. The male federal express associate indicated that they would be redelivering plaintiff's directory to the funeral home as requested. The Federal Express associate said they'd gotten a message via their internal email system via a call that the package "contained a uniform needed for a funeral of a high ranking military officer." Plaintiff knows that he mentioned that either the funeral home was in Philadelphia or that the call came from someone in Philadelphia.

13

45. D. Worley is the federal express agent that says she got the "military officer" call right after she hung up from speaking with plaintiff regarding the status of the delivery of the directory plaintiff ordered. Worley alleges she made a mistake and put the information into plaintiff's account. The timing of the call with the message and Philadelphia tie in was just the defendants directly and or indirectly through their (non-party ) co-racketeers know they were setting the stage for the disaster plot. The defendants were directly and or indirectly through their co-racketeers demonstrating how they could control plaintiff's business by unlawfully obtaining her property and using it.

46. Associating plaintiff's Who's Who directory with a funeral was a veiled threat that the defendants directly and or indirectly through their (non-party ) co-racketeers were causing to be disseminated via the wires. The message was that, plaintiff's concert was a dead issue. It would not come take place, it would not be successful.

47. During a phone call to Philadelphia on 6/28/10 to an organization that does the work of Dr. King plaintiff was discussing connecting with the organization to support her concert, The Musical Tribute to Dr. King but, the defendants directly and or indirectly through their co-racketeers were at work to make sure plaintiff did not do business in Philadelphia. They'd instilled a reign of fear in most of the churches, businesses and individuals in Philadelphia and plaintiff's concert was a gospel concert. Plaintiff didn't advertise her tie to Mumia but, because the defendants were illegally controlling plaintiff's business when they felt like it and illegally obtaining her property they knew plaintiff was trying to do business in Philadelphia and weren't going to allow it. They certainly weren't going to allow plaintiff to profit from her business especially in Philadelphia where Mumia was convicted.

14

48. Plaintiff was also inviting the librarians to attend The MLK Assassination Trial Panel
Discussions she was bringing to Philadelphia. Plaintiff was inviting librarians to attend free of charge
in hopes that they'd help get the audiobook into the libraries. A large sample of the audiobook would
be available for listening at the event but, selling the audiobook would mean profit and the defendants
directly and or indirectly through their (non-party ) co-racketeers simply would not allow plaintiff to do
any successful business in Philadelphia because they didn't want plaintiff's business to profit at all
especially in Philadelphia.

49. Plaintiff never advertised to the defendants nor their co-racketeers that she was trying to do
business in Philadelphia but, the defendants directly and or indirectly through their ( non-party ) co-
racketeers made it their business to know by illegally obtaining plaintiff's confidential business
information ( email login and password, business contact information such as emails, data
communications etc. ) and her legal property interest to contract with anyone she wants and run her
business in the manner she wants absent them forcing themselves in as uninvited silent partners.

50. On 5/11/12 plaintiff sought to obtain the phone records from T-Mobile for the Philadelphia call.
All of a sudden the T-Mobile computer started changing plaintiff's address on its own from the one the
representative had just seen and given to plaintiff. The supervisor nor the representative understood
why it was happening but said there was some malfunction taking place and gave plaintiff a credit as a
result of all the time she was on the phone with them. The defendants directly and or indirectly through
their (non-party) co-racketeers were obtaining plaintiff's confidential business and personal
information. Plaintiff was trying to obtain the records to have for this case but, the defendants nor their
(non-party) co-racketeers wanted plaintiff to pursue them in court absent the racketeering so, they were
utilizing their expertise and resources to unlawfully obtain plaintiff's property and her legal property
interest. Just like they did with the MLK Press release.

15

51. After plaintiff started seeking sponsorship for The Musical Tribute to MLK in Philadelphia she learned that one of the companies she contacted for sponsorship had been targeted by the Philadelphia FOP ( non-party ) co-racketeers and used the wires to get members and other supporters nationwide to join their circulation of false information against the company because the FOP thought they were supporting and funding the Mumia Legal Defense.

52. The ( non-party) co-racketeers were causing a big stink that was scaring the bejesus out of buyers that carried the companys' product. The distributors were getting calls of serious concern. The circulation on the internet of the false and damaging information was done underground. It was so hard for the company to pinpoint who was actually responsible that they had to contact the Philadelphia FOP Lodge to put a stop to it. Nevertheless, the damage had been done, the company felt the hit and had to spend time and resources to get around the attempt to damage the business by employing the fear tactics. The defendants were directly and or indirectly through their (non-party) co-racketeers were using the same racketeering tactics against plaintiff.

53. Plaintiff was not able to do business in Philadelphia where her events would have been a financial success because the defendants directly and or indirectly had caused such an environment of terror and or divisiveness between businesses/organizations that would normally support Dr. King events/projects but, McNesby, Faulkner and Canterbury had directly and or indirectly through their (non-party) co-racketeers were at work to make sure plaintiff wasn't able to develop certain business relationships nor do any successful business in Philadelphia.

16

54. Since the defendants and the ( non-party) co-racketeers ply their racketeers through their resources quite often underground where one can't log into their website and or attend the secret gatherings, lots of the evidence of the racketeering is in the possession of the defendants and their (non-party) co-racketeers that plaintiff simply doesn't have access to. The fact that law enforcers ( federal state, city along with fire personnel and private individuals they recruit ) are involved as non-party co-racketeers they have access to information that is proprietary ( law enforcement computers, telephone company resources etc. ) and utilize their resources to further their racketeering conspiracy. Their history and reputations alone were enough to scare the bejesus out of any business owner or private individual.

55 . Plaintiff's MLK Assassination Trial Panel Discussions was scheduled for 1/14/11 in Philadelphia It was planned as a tour. The panel discussions featured high profile well known individuals very well versed on the assassination such as legislators, authors, lawyers, investigators and a medical expert. Some of them were also high profile Mumia supporters as well that the defendants and their (non-party ) co-racketeers despised, they were on the target list of the FOP defendants and (non-party ) co-racketeers.

56. Plaintiff had begun communicating with  radio personalities to  moderate the panel discussion in Philadelphia in 4/10. The radio moderator in Philadelphia is a very outspoken lawyer that works closely with Mumia. The defendants and their (non-party) co-racketeers knew he had the radio contacts that could help generate ticket sales so, when they unlawfully obtained plaintiff's property ( confidential data communications, email login, password, computer login and her right to do business in any state absent the racketeering) they used it to once again ply their racketeering to use it to their advantage and plaintiff's disadvantage. They'd use it to their advantage to railroad plaintiff's efforts including but not limited to damaging the computer and spreading false information via the wires that plaintiff was some sort of radical or other criminal element.

17

57. Plaintiff's efforts to do business in Philadelphia were once again halted because the defendants directly and or indirectly through their co-racketeers were unlawfully obtaining plaintiff's confidential business information ( data communications from her email communications, passwords, logins ) to employ their racketeering so that plaintiff wouldn't be able to have a successful event in Philadelphia. Plaintiff's email had a confidential login and password and her communications with those she was trying to do business with in Philadelphia were confidential. Plaintiff had not invited any of the defendants nor their (non-party ) co-racketeers in as silent partners but, they would force themselves in and then use plaintiff's property to their advantage and plaintiff's disadvantage. While they were plying their racketeering they would also damage plaintiff's computer.

58. On 11/12/09 plaintiff flew to Jackson, MS to meet with a lawyer. Plaintiff's travel arrangements were sent to her email address. Plaintiff's computer has a confidential login, confidential password. Plaintiff did not advertise her business, travel arrangements nor schedule to any of the defendants nor the ( non-party) co-racketeers but, they'd force themselves into plaintiff's business and what she had a legal property interest in as if they had a legal right to her confidential business information They'd then travel and or use the facilities to disseminate via the wires, state to state plaintiff's illegally obtained property ( data communications, computer login, passwords, business contacts information ) to their advantage to further the wire fraud/extortion/identity theft scheme.

59. Once plaintiff arrived in Jackson, MS there was an unwelcome physical presence of Jackson, MS police with plaintiff's arrival and departures to and from the hotel. The particular lawyer plaintiff met with worked on a case involving Assasta Shakur who was convicted of murdering a NJ law enforcer. The FOP (non-party) co-racketeers are known nationwide to have a severe vendetta out against anyone that assisted Shakur even if it is professionally and or indirectly. Plaintiff doesn't even know Shakur and the lawyer is a very high profile successful lawyer who is a business contact of plaintiff's but, plaintiff had never invited any of the defendants nor their (non-party) co-racketeers in as silent partners.

18

60. As late as 1/12/12 the PA FOP defendant McNesby was sending out a veiled threat via the wires to the PA Mayor for supporting Poet Sonia Sanchez simply because she refused to cooperate in the manner he believes she should've with law enforcement while totally dismissing the full totality of her position on the issue of Shakur.

61. On 2/13/12 plaintiff communicated with PA lawyers regarding their reviewing Co-Operating Attorney paperwork plaintiff would be sending for them to consider handling cases on behalf of a non profit Civil Rights organization plaintiff was forming that would operate pretty much like the ACLU. The organization was to be formed in Philadelphia with its headquarters in Philadelphia.

62. The defendants and their co-racketeers didn't want plaintiff making a living nor profit through her Special Events Planning Company doing things the way plaintiff wanted to so, plaintiff had to look to create another job for herself. The defendants nor the (non-party) co-racketeers didn't like the non profit Civil Rights idea either even though plaintiff hadn't advertised her plans to them, they knew because they will unlawfully using the wires to unlawfully obtain plaintiff confidential business information and what she has a legal property interest ( business communications being confidential, passwords, logins, business contact information and the right to do or attempt to do business in any state absent the racketeering)

63. Plaintiff had communicated with lawyers in Philadelphia to handle the legal paperwork to incorporate. Plaintiff had communicated with potential Board Members 2/27/13 and Honorary Board Members. On 2/27/13 discovery of an affidavit defendant Shuttlesworth sent plaintiff and an email plaintiff had from Shuttlesworth relative to discovery for the case was illegally obtained as well as a lot of other discovery. The defendants and (non-party) co-racketeers were trying to protect Shuttlesworth and halt plaintiff from pursuing them in court absent the racketeering. Mumia was invited as an Honorary Board Member 2/2/2012 through his legal counsel.

64. The organization would operate pretty much like the ACLU and plaintiff was connecting with profile potential Board Members and high profile potential Co-Operating Attorneys. Forming the organization and meeting with some of the potential board members, marketing materials all required money though. As a result of the defendants racketeering plaintiff was not financially able to pay the lawyers, get the marketing materials produced nor meet with the potential out of town board members nor attend conferences she needed to for one of the programs she would be proposing to the board. As a direct and proximate cause of the defendants and their (non-party) co-racketeers plaintiff's forming and getting the new Civil Rights organization up and running has been delayed.

65. Whenever plaintiff would try to get around the defendants and the (non-party) co-racketeers unlawful racketeering they'd get very upset and cause adverse situations to be employed from state to state. Had they not been unlawfully obtaining plaintiff's confidential business information and or any other property plaintiff had a legal property interest ( her logins, passwords, data communications, contact information for her business contacts ) including confidential business information relative to preparing this case they wouldn't know what plaintiff's business plans were.

66. A fine example of the defendants directly and or indirectly through their ( non-party ) co-racketeers plying their racketeering against plaintiff when they unlawfully obtained plaintiff's property to use to their advantage is, they'd damage or cause damage to plaintiff's computer and what she had a legal property interest in on the computer. For instance on 4/20/13 when plaintiff sought out a private investigator to obtain the mailing address for defendant Faulkner, the defendants directly and or indirectly through their ( non-party ) racketeers caused plaintiff not to be able to submit her request via the investigators online website and caused plaintiff not to be able to view the contact number on the investigators website. The investigator left plaintiff a phone message that nobody else had problems with the online form and that the phone number was indeed on the website.

20

67 . On 2/27/13 plaintiff's communications with potential board members were suppose to be confidential but, they weren't. By unlawfully obtaining plaintiff's property and what she had a legal property interest, they'd use it to their advantage and plaintiff's disadvantage including but not limited to plaintiff's legal property interest in preparing and pursuing this legal case and trying to make a living through her Special Events Planning Company in the manner she wanted to.

68. Another fine example of the defendants unlawfully obtaining plaintiff's confidential business information and using it to their advantage is on 2/25/13 plaintiff communicated ( see exhibit #2 ) with a NY Attorney licensed to practice in various jurisdictions including the one this court is located. The NY Attorney represented the King family during the assassination trial of Dr. King. Plaintiff sent the NY Attorney an email after their phone conversation and all of a sudden within minutes, out of the blue the U.S. Airways Attorney sent plaintiff an email ( see exhibit # 3 ) reply to an old email sent 2/20/13.

69 . Plaintiff's business communications were suppose to be confidential but, the defendants directly and or indirectly for some reason felt it was theirs to obtain and use to their advantage and plaintiff's disadvantage. Any and everything plaintiff did regarding her business and this legal case was never voluntarily shared with them but, they forced themselves in and took plaintiff's property and anything plaintiff had a legal property interest in whenever they felt like it.

70. Plaintiff had contacts and communications for/from buyers in the U.S. as well as outside the U.S. for her audiobooks. Plaintiff had contacts and communications for her concerts in various states. None of which was offered free of charge to the defendants nor their (non-party) co-racketeers. They simply forced themselves in and took whatever they wanted and disseminated and otherwise use it to their advantage and plaintiff's disadvantage.

21

71. During the weekend of 3/8/13 plaintiff was in New Jersey to edit the Troy Davis audiobook which she would sell to libraries and the public in the jurisdiction this court sits as well as other states. Plaintiff stayed at a hotel she'd stayed previously. When plaintiff returned to the hotel from going to Walgreens plaintiff was not able to enter the room with her keycard no matter how many times she tried. The assistant manager got a master key to let plaintiff in then, he directed his attention to the inside of the keycard gadget.

72. The screw had been pulled out a lot to demonstrate someone had intentionally pulled it out. It wasn't like that prior to plaintiff leaving the room. The defendants directly and or indirectly obtained and or caused their co-racketeers to obtain plaintiff's legal property interest in not having her business relationships damaged with the hotel (trust level ), her legal property interest to conduct business in any state she wants absent the racketeering and her legal property interest to contract with any hotel and have and benefit from all the amenities and services included in her contract absent the racketeering.

73. There was a huge anti Mumia effort in New Jersey with the fire and police supporters. When plaintiff left the hotel on both occasions to go to Walgreens the fire personnel would use the wires to further their racketeering conspiracy and conduct perfectly timed stalking drive bys with blarring sirens upon plaintiff's arrival to Walgreens even though plaintiff didn't advertise her travel to the (non-party) co-racketeers, they made it their business to know. The hotel was also frequented by NJ police (co-racketeers ) as well.

74. The Troy Davis audiobook was a project that the defendants and the (non-party) co-racketeers weren't happy about plaintiff working on because Troy Davis had 650,000 thousand supporters who thought he'd been framed. Plaintiff's audiobook certainly gave a more extensive look into what the public knew about the case. The testimony from the trial on plaintiff's audiobook certainly point in the direction that law enforcement and Prosecutors had racked another wrongful conviction.

75. On 6/19/13 during the time plaintiff was preparing this case, all of a sudden out the blue
plaintiff got a blind email (without all email addresses shown ) from one Rev. Shuttlesworth's
daughters ( see exhibit #4 )  Plaintiff had also been getting emails from defendant Shuttlesworth as
she prepared this case.  One of defendant Shuttlesworth's email was sent on 3/25/13 to plaintiff
with an offensive statement.  Plaintiff hadn't communicated with defendant Shuttlesworth since
plaintiff left Birmingham, AL other than to give her advance notice of civil suit. Plaintiff hadn't
gotten an email from Rev. Shuttlesworth's daughter since 2008.  With the defendants and the (non-
party) co-racketeers unlawfully obtaining plaintiff's property relative to this case,  plaintiff wasn't
allowed her legal property interest to prepare and pursue the case in a confidential manner.

76. On 6/15/12 plaintiff checked Yahoo's system to see who had been accessing her email. The
records indicated that plaintiff's computer was being accessed from California and that the log ins
to her browser were from Washington. On 4/14/13 when plaintiff checked again, Yahoos'
system indicated plaintiff was accessing her browser from Chicago and that the logins were from
Chicago and Arizona. Plaintiff wasn't in California, Arizona nor Washington ( see exhibit #5 – 4 pages )

77. From 11/12/09 to present Defendant Shuttlesworth conspired with her co- defendants and the
co-racketeer ( non-parties ) to illegally **EXTORT/ATTEMPT EXTORTION** by unlawfully obtaining
plaintiff's property (confidential information) and or her legal property interest by employing or
causing plaintiff to fear physical and or economic harm to induce and or attempt to induce plaintiff to
part with her property and or legal property interest.

78. Defendant Shuttlesworth, her co-defendants and (non-party) co-racketeers knew plaintiff would
never have parted with her property nor her property she had a legal property interest in, IF plaintiff
had known that defendant Shuttlesworth was actually an undercover racketeer vs. the friend and
business partner she falsely pretended to be.

23

79. Defendant Shuttlesworth, her co-defendants and the co-racketeers knew they weren't entitled to any of plaintiff's property under those false pretenses. As a result, interstate commerce was affected. Shuttlesworth, her co-defendants and the co-racketeers used plaintiff's property that was unlawfully obtained to try to make her go a different route with her business, entrap her to take her freedom, bring her business to a halt, discredit her as a Special Event Planner and deter plaintiff from holding the defendants accountable in court absent the racketeering.

80. From 11/12/09 to present defendant Shuttlesworth knowingly devised a scheme along with her co-defendants and co- racketeers to use the interstate wires to defraud plaintiff to obtain property under false pretenses and by concealing material facts and then sharing/disseminating plaintiff's property ( business and personal information and her right to contract with whomever she wants to make a living and profit absent the racketeering) to further the goal of the racketeering conspiracy

81. While posing as a friend and business partner from 11/12/09 – 10/11 to plaintiff, she concealed the fact she was participating in the racketeering conspiracy to set plaintiff up through use of the wires. During 7/11 while plaintiff was at defendant Shuttlesworth's home, plaintiff told her about a case where the plaintiff had been set up by her roommate who was working with law enforcement to entrap her. Defendant Shuttlesworth specifically told plaintiff that plaintiff "did not have to worry about that with her"( her working against plaintiff with law enforcement ) but, defendant was working with her co-racketeers and using the wires to obtain plaintiff's property to  further the racketeering  - **WIRE FRAUD**

24

82. From 11/12/09 to present defendant Shuttlesworth with her co- defendants and (non party ) co-racketeers directly and or indirectly devised a scheme of Extortion/ Attempted Extortion and Wire Fraud to illegally obtain or caused to be illegally obtained plaintiff's property (1) confidential business information, (2) her legal property interest to make a living and profit through her Special Events Planning company absent the racketeering and (3) her legal property interest to prepare and pursue holding them accountable in court absent the racketeering and they traveled the skyways, byways and highways and or used facilities in interstate commerce to further/facilitating the racketeering conspiracy by disseminating/sharing/using via the wires, plaintiff's illegally obtained property to their advantage and plaintiff's disadvantage in violation of the **TRAVEL ACT**.

83. From June 2011 to October 2011 while at Shuttlesworths' home there were instances where she went out of her way to cause plaintiff to be fearful and or intimidated like her co-defendants and the (non-party) co-racketeers were doing. One morning plaintiff woke up and saw **a noose hanging from a tree** in the backyard that was not there when plaintiff arrived.

84. Plaintiff showed it to defendant Shuttlesworth who didn't seem concerned. She falsely alleged that it was there when she moved in. It was an effort to intimidate plaintiff to get out of Birmingham. Rev. Shuttlesworth was doing well and the funeral would be soon.

85. During plaintiff's stay at defendant Shuttlesworth's home in 6/11 she showed plaintiff legal documents of communications between her lawyer and defendant Massengill's lawyer dated 1/12/08, 1/16/0, 1/17/08, 1/19/08, 1/20/08 and a copy of a legal ruling however, showing plaintiff the legal documents and taking plaintiff to copy them was all part of the racketeering scheme where in short order, defendant Shuttlesworth would be accusing plaintiff of possibly stealing the legal documents in front of a Birmingham Police Officer ( non-party) co-racketeer.

25

86. Defendant Shuttlesworth knew plaintiff was making copies of the documents and she actually took plaintiff to make the copies of the documents.

87. On 10/10/11 she **falsely accused** plaintiff of possibly stealing the documents right in front of a Birmingham police officer she'd brought to her home to escort plaintiff out AFTER she plotted with the other racketeers to create the City Council media blitz to spark havoc between she and plaintiff because plaintiff couldn't afford to be in the news with any mess that could cause damage to her Cleveland concert and other events/projects nor interfere with money for business and personal bills the concert would help cover including housing.

88. Shuttlesworth directed plaintiff to give the legal documents back including the copies she knew plaintiff had made of them. Once plaintiff made copies of the legal documents they were plaintiff's property but, because Shuttlesworth had already falsely accused plaintiff of possibly stealing the legal documents and because plaintiff feared an arrest, plaintiff gave the originals and the copies of the documents back.

89. While plaintiff was packing to leave defendant Shuttlesworth's home Birmingham Police Officer D. Carter badge #693 was being given instructions by someone on a cell phone he was using. Shuttlesworth made false statements that she didn't know plaintiff would be using the legal documents for a civil suit she was filing against the Shuttlesworth siblings pretended that she didn't know plaintiff but, she knew and even encouraged plaintiff suing her step-children. Plaintiff now understands now that her doing so was all part of the racketeering scheme to entrap plaintiff and later falsely accuse her of possibly stealing the legal documents and pretending she didn't know, wasn't involved in encouraging and providing information for plaintiff to sue her step-children.

26

90. Plaintiff and defendant Shuttlesworth would talk via phone long distance as far back as 11/12/09 – 10/11, all the while with defendant Shuttlesworth pretending to be a friend and business partner when she was actually using the wires to obtain strategy for the case and other property to disseminate and use for the purpose of furthering the racketeering conspiracy and she would also be unlawfully using the wires to record some of their phone conversations.

91. Defendant Shuttlesworth was to plaintiff what Julius Butler was to Geronimo Pratt, a racketeer doing her share to extort plaintiff of her property during the calls for her benefit and that of her co-racketeers. The property that defendant Shuttlesworth illegally obtained from plaintiff was not only obtained while she was in Birmingham, AL she continued to illegally obtain plaintiff's property and then illegally share/disseminate it with the co-racketeers in various states she traveled and or communicated it to further the racketeering conspiracy.

92. Plaintiff was aware of various legal matters involving Rev. Shuttlesworth only because defendant Shuttlesworth had told plaintiff about the matters. Plaintiff would communicate with lawyers for defendant Shuttlesworth with her permission and would c.c. her on the email and, those emails are available for discovery in this case.

93. Shuttlesworth giving plaintiff legal documents to copy was not at all anything plaintiff had to steal. It was just an extremely **false**, offensive, hurtful and very costly allegation being made by someone plaintiff trusted and was so close to who turned out to be to plaintiff what Julius Butler was to Geronimo Pratt , an undercover racketeer posing as a friend working with law enforcement ( for no legitimate law enforcement purpose ) to obtain plaintiff's property to set her up, take her freedom and cause as much damage as possible to plaintiff in her business and legal property interest.

27

94. The defendants nor the (non-party) co-racketeers wanted plaintiff attending Rev. Shuttlesworth's funeral because they didn't want plaintiff to connect with **Holder.** There was a movement for Holder to open a civil rights investigation into Mumia's case and unbeknownst to plaintiff, there was a "continuing investigation" of plaintiff by the JTTF/FBI based on records the FBI turned over to plaintiff 5/13. Plaintiff alleges the "continuing investigation" is for no legitimate law enforcement purpose but, only for the purpose of plaintiff's first amendment activity and associations.

95. On 6/17/11 plaintiff traveled from Birmingham, AL with a stop-over in N.C. in route to Newark, NJ to edit the MLK Assassination Trial audiobook. Plaintiff had an assigned seat on the N.C. flight but when plaintiff went to get into her seat, a Nigerian ( unknown co-racketeer – non party ) woman with 2 tickets in plaintiff's name was in her seat on the U.S. Airways flight. Plaintiff did not know the woman and was extremely fearful over the identity theft and that's just what the racketeers wanted ( fear).

96. Participating Unidentified TSA defendant doe was also in on the scheme because the Nigerian woman ( unknown co-racketeer – non party ) had to have gone through the TSA with a photo id and name matching the tickets no matter what destination she originated. The Unidentified U.S. Airways doe (2 Gate attendants and 1 flight attendant doe defendants )   participated as well by throwing 9/11 security procedures out the window to further the racketeering conspiracy. The woman simply walked off the plane without anyone from TSA or Homeland Security speaking to plaintiff and plaintiff didn't see anyone in security speak to the woman either. Plaintiff's legal property interest to travel to conduct business absent the racketeering was illegally obtained. The defendants and the (non-party) co-racketeers would use the wires to coordinate these unlawful plots.

28

97. A white male participating doe  (non party ) who appeared to be with Homeland Security went into the pilots area while plaintiff was up on the plane trying to figure out how the lady got tickets in her name and what was going to be done about finding out who she was and why she had them. Plaintiff was talking with the flight attendants on board and then plaintiff went out to the gate area to see if the Nigerian lady was out there and what was going on. She was gone.

98. 7/20/11 on the way back from Newark, NJ to Birmingham after editing the MLK Audiobook, there was a stop over to the Memphis, TN airport. Unidentified Doe black male (non-party ) TSA or Homeland Security participant used his radio (wires) to loudly notify someone that plaintiff was "on her way" to the gate area. As if plaintiff were some sort of security threat. It was a false damaging impression that he used the wires to communicate. Plaintiff was traveling to try to make a living through her Special Events Planning company.

99. Defendants directly and or indirectly obtained and or caused to be obtained plaintiff's legal property interest not to have business relationships with the airline and airports damaged, her legal property interest in traveling free of the racketeering and  her legal property interest in her reputation of being a law abiding passenger vs. a criminal element they were painting her as. The defendants and the (non-party) co-racketeers assumed there would be a black on black confrontation between plaintiff and the Nigerian woman and or the airline personnel and or the airport personnel and or the security personnel which would generate an arrest to obtain plaintiff's freedom.

100. Plaintiff checked out of the Birmingham Airport Holiday Inn on 10/15/11 to catch a plane back to Chicago. While at the Fred Shuttlesworth Birmingham Airport unknown participating black male (non-party) co- racketeer waited to board the same plane plaintiff was, used his cell phone (the wires ) to call someone detailing plaintiff's itinerary.

101. Once again plaintiff was being reported on via use of the wires (radio) to falsely paint plaintiff as some security risk traveling from state to state. Defendants directly and or indirectly obtained or caused to be obtained plaintiff's legal right to travel free of their racketeering, her legal property interest not to have her reputation of a law abiding airline passenger obtained, and her legal property interest not to have business relationships with airlines and airports damaged and her legal property right to try to make a living and profit through her Special Events Planning Company doing things the way plaintiff wanted to do them absent the racketeering.

102. After plaintiff left Birmingham she did a bit of checking around to see if the KLAN was still active in Birmingham, Alabama. Plaintiff knew the noose hanging in the tree of the Shuttlesworth's backyard was not there when she first arrived as it was a shocking sight. Plaintiff contacted someone with a very long history of successfully researching and going against the klan in various states.

103. Plaintiff was told that they had information that the klan was indeed alive and well in areas very close to Birmingham, AL. Plaintiff has no information as to which uniform they wear these days out in Alabama but, the racketeering included a rainbow of participants with vast resources spanning state to state. Use of the wires was a method the racketeers used  and traveling the highways, byways, skyways in interstate commerce was one of the methods used to disseminate/transport plaintiff's unlawfully obtained property to further the racketeering conspiracy. Illegally obtaining plaintiff's property for this case was by no means an exception to the rule.

104. Plaintiff was also producing a festival to be held in Washington after plaintiff's Cleveland, OH concert. The venue was providing sponsorship in excess of $195,000 ( One Hundred Ninety Five Thousand in kind ) for plaintiff  to bring the event to their venue which would have generated money for the venue, Washington and  plaintiff.

30

105. Plaintiff had planned to use the money generated from the Cleveland concert to pay for various cost associated with the festival. As a direct and proximate cause of the defendants pattern of racketeering plaintiff ended up having to delay pursuing the festival until she could get the racketeers in court because they simply wouldn't allow plaintiff to contract, fulfill contracts nor benefit from economic advantages. The plot ( City Council Media blitz ) to cause the rift between plaintiff and defendant Shuttlesworth put plaintiff in a position where she just couldn't make it happen with the festival.

106. From 3/7/12 – 3/14/12 defendant Gersh conspired with the other defendants and co-racketeers to knowingly devise a scheme to use the wires to defraud plaintiff and the Better Business Bureau in California to obtain plaintiff's property under false pretenses by concealing material facts to further the goal of the racketeering conspiracy – **WIRE FRAUD**

107. Defendant Gersh conspired with the defendants and other co-racketeers to further the conspiracy by means of false and fraudulent pretenses from a banking institution on 3/7/12 by falsely pretending that plaintiff had given him verbal permission on that day to withdraw over $500.00. Plaintiff did not speak to him on 3/7/12 authorizing the withdrawal because plaintiff did not have the money in her Bank One business account. Bank One does business in this jurisdiction as well.

108. Plaintiff hadn't spoken to Gersh by phone for some time. The only communications she'd had with him were via email each time telling him she had no money to pay the bill. The account did not have $500.00 in it for plaintiff to authorize him to make a withdrawal of that amount of money. Because Gersh was working with his co-racketeers, he had some inside information that plaintiff didn't have which was that plaintiff had some sort of overdraft on the account. It was very unusual for the bank to cover such a large amount on plaintiff's account.

31

109. Gersh knew that the bank would rely on him being honest when he used the wires to illegally make the withdrawal.

110. Since the defendants were directly and or indirectly through their co-racketeers taking control of plaintiff's identity ( passwords, logins accounts ) they were able to make anything happen. $500.00 was a huge amount for the bank to approve given the status of plaintiff's account.

111. The bank ended up closing plaintiff's business account because plaintiff refused to make the payment since plaintiff had not given Gersh permission to withdraw from an account that didn't have the money to pay him. Plaintiff was forced to have to find another bank to open a business account with even though her business account had been with Chase over 3 years.

112. On 3/14/12 Gersh told the Better Business Bureau that he'd spoken to plaintiff on 3/7/12 via phone and that plaintiff had given him permission on that day to withdraw over $500.00 ( Five Hundred Dollars ) from her business account. Gersh knowingly executed a scheme to defraud the bank of money under the custody/control of the bank.

113. Plaintiff had defendant Gersh via email she didn't have any money when he last contacted plaintiff via email. Gersh obtained the money under false pretenses and concealed the fact that he had not spoken to plaintiff on 3/7/12 and that plaintiff did not give him permission on that day nor any other day to make the withdrawal. The bank relied on Gersh's false misrepresentation, gave him the money that plaintiff didn't have in her account and ended up closing plaintiff's account as a result. Gersh did so to further the racketeering conspiracy – **BANK FRAUD**

32

114.  From 3/7/12 to 3/14/12 Defendant Gersh conspired with the other defendants and the
co-racketeer ( non-parties ) to illegally **EXTORT/ATTEMPT EXTORTION** by unlawfully obtaining
plaintiff's property (confidential information) and or her legal property interest by employing or
causing plaintiff to fear physical and or economic harm to induce and or attempt to induce plaintiff to
part with her property and or legal property interest. Defendant Gersh, her co-defendants and
co-racketeers knew plaintiff would never have parted with her property nor her property she had a legal
property interest in, IF plaintiff had known that defendant Gersh was actually an undercover
racketeer vs. the friend and business partner she falsely pretended to be.

115. Defendant Gersh, his co-defendants and the co-racketeers knew they weren't entitled to any of
plaintiff's  property under those false pretenses. As a result, interstate commerce was affected.
Defendant Gersh, his co-defendants and the co-racketeers used plaintiff's property that was unlawfully
obtained to try to make her go a different route with her business, entrap her to take her freedom, bring
 her business to a halt and discredit her as a Special Event Planner.

116. On 3/7/12 – 3/14/12 defendant Gersh with his co- defendants and (non party )
co-racketeers directly and or indirectly devised a scheme of Extortion/ Attempted Extortion
to illegally obtain or cause to be illegally obtained plaintiff's property (1) over $500.00 out of her
business account that did not have the money in it (2) her legal property interest not to have her
business relationships damages and or otherwise obtained  (3)  her right to hold all racketeers
accountable absent the racketeering and traveled and or used facilities in interstate commerce to
further/facilitate the racketeering conspiracy by disseminating/sharing/using plaintiff's illegally
obtained property to their advantage and plaintiff's disadvantage in violation of the **TRAVEL ACT**

117. To top all that off the defendants wanted to ply their racketeering in the court so, they used the same racketeering acts of Wire Fraud, Identity Theft, Extortion, Attempted Extortion, Travel Act Violations to illegally obtain plaintiff's confidential business information relative to this case being prepared and used it to their advantage by disseminating the information, destroying documents, changing text in emails, changing documents, taking documents, adding documents and destroying emails etc.

118. Documents would come up missing, plaintiff wouldn't be able to access information others could on google because the defendants wanted to obtain her legal property right to hold them accountable absent the racketeering. Defendants Faulkner, McNesby and Canterbury utilized their (non-party ) co-racketeers who are law enforcers and fire personnel to utilize their positions, expertise and access to proprietary information ( logins, passwords other confidential information, protected computers, protected law enforcement computers and other agency computers that are only suppose to be used for legitimate law enforcement purposes, not to search for plaintiff's history and then terrorize her with it via the wires ) from plaintiff's computer, web hosting companies and internet providers. The illegally obtained information was shared with defendant Gersh, Shuttlesworth and anybody else they were able to get to join them in furthering the conspiracy to use the illegally obtained information to their advantage

119. Plaintiff had a legal property interest in having all her business and personal communications relative to pursuing the defendants in court being confidential because plaintiff's computer had a protected password and login, her phone contract only had her name on it and her right to pursue contracting with whoever she wanted to make a living and profit through her Special Events Planning Company were illegally obtained directly and or indirectly by the defendants and or through their co-racketeers, so any statute of limitations issues should be a non issue due to racketeering.

34

120. Defendants directly and or indirect obtained or caused to be obtained plaintiff's legal property interest to run her business absent them forcing themselves in as silent partners to railroad her contracts, potential contracts, economic advantages and potential economic advantages, her identity to use to their advantage in obtaining her property and all she had a legal property interest. Plaintiff's financial losses are in excess of $200,000 ( Two Hundred Thousand Dollars ). Plaintiff is entitled to triple any damages she can prove, costs, interest and any Attorney Fees if plaintiff is able to get an Attorney to represent her business as an additional plaintiff.

## RACKETEERING – 18 USC 1962 ( c ) – Associates in Fact

Maureen Faulkner, John McNesby, Chuck Canterbury, Sephira Shuttlesworth, David Gersh Unidentified TSA defendant doe and ( non-parties ) Unknown FBI Agents, Unknown FOP Members, Unknown Other Supporting Union Members and Other Unknown Private individual co-racketeers

121. Plaintiff restates paragraphs 1-120 as though fully state herein.

122. The defendants constitute an "enterprise" within the meaning of Section 1962 ( c ) who are a group of individuals associated in fact.

123. Members of the enterprise share the common purpose of trying to force plaintiff to go a different route with her business, and to deter plaintiff from suing the defendants absent the racketeering, causing plaintiff to fear physical and economic harm. The members of the enterprise are all related in that they are all anti Mumia Abu Jamal who feared the Shuttlesworth connection and plaintiff using money from her business to donate to Mumia's legal defense fund. It's continuing and not likely to stop absent court intervention and a huge financial blow.

35

124. From 11/12/09 to present each of the defendants conspired with their co-racketeers ( non-parties ) to participate directly and or indirectly in the affairs of the enterprise through a pattern of racketeering in violation of Section C and conspired to do so by the same means in violation of Section D. The racketeering violations as outlined in the previous paragraphs related to if individual defendant consists of various racketeering acts such as Wire Fraud, Extortion, Attempted Extortion, Identity Theft, Bank Fraud and Travel Act violations to illegally obtain and or cause damage to plaintiff's business and her legal property interest including her contracts, potential contracts, prospective economic advantages, her computer etc. Plaintiff's financial losses exceed $200,000 ( Two Hundred Thousand Dollars ).

125. The **legitimate** purpose of the enterprise is for the defendants to support First Responders in the work they do for the community. The **illegitimate** purpose of this group of individuals associated in fact is to is to try to force plaintiff go in a different direction with her business and to attempt to stop plaintiff from being able to pursue them in court absent the racketeering by illegally obtaining/steeling plaintiff's property through a pattern of racketeering to use to their advantage and plaintiff's disadvantage. Plaintiff was always their target but, the defendants have a long history of conducting the affairs of the enterprise through a pattern of racketeering with other victims as well.

126. From 11/12/09 to present McNesby, Faulkner, Canterbury with their co-racketeers agreed to devise a **WIRE FRAUD** scheme to defraud plaintiff, the owners that host and maintain the sites that required the confidential passwords and logins ( banks, business account websites, yahoo etc. ) and the public through use of the wires in furtherance of the scheme to directly and or indirectly through their co-racketeers obtain plaintiff's property ( computer login, email login and passwords, business contacts' information, data of the communications, confidential information regarding this case ) from her computer, email account and business accounts, under false pretenses. Defendant Shuttlesworth blamed plaintiff for the problems she was having with her events/projects when in fact the racketeering was the direct and proximate cause.

36

127. From 11/12/09 to present defendants Faulkner, McNesby and Canterbury with their co-defendants and (non party ) co-racketeers devised an **INDENTITY THEFT** scheme to defraud plaintiff, the owners that host and maintain the sites that required confidential passwords and logins ( banks, business account websites, yahoo etc. ) and the public to directly and or indirectly through their (non-party) co-racketeers transfer, possess and or use or caused to be transferred, possessed and or used. plaintiff's identity to obtain her confidential business property ( computer login, email login, passwords, business contacts information, data of business communications, airline tickets etc. )

128. From 11/12/09 to present Defendants Faulkner, McNesby and Canterbury conspired with the other defendants and the co-racketeer ( non-parties ) to illegally directly and or indirectly **EXTORT and ATTEMPT EXTORTION** by unlawfully obtaining plaintiff's property (confidential business information, passwords, logins, data communications, business contacts information etc.) and or her legal property interest by employing racketeers acts causing plaintiff to fear physical and or economic harm to induce and or attempt to induce plaintiff to part with her property and or legal property interest.

129. The defendants would directly and or indirectly through their ( non-party ) co-racketeers also damage or cause plaintiff's computer to be damaged by putting things like camcorders on it that plaintiff couldn't get off and other programs that would result in plaintiff's computer shutting totally down when she tried to remove it and otherwise obtain her legal property interest to be the only one controlling her property ( computer ) and all programs associated with it. By controlling plaintiff's computer they would take data, change data, add data that plaintiff had never seen before, move data add pictures etc and also cause plaintiff to have to change her password.

37

130. From 11/12/09 to present defendants Faulkner, McNesby and Canterbury with their co-defendants and (non party ) co-racketeers directly and or indirectly devised a scheme of Extortion/ Attempted Extortion to illegally obtain or caused to be illegally obtained plaintiff's property (1) confidential business information, (2) her legal property interest to make a living and profit through her Special Events Planning company absent the racketeering (3) her right to hold all racketeers accountable absent the racketeering and traveled and or used facilities in interstate commerce to further/facilitating the racketeering conspiracy by disseminating/sharing/using plaintiff's illegally obtained property to their advantage and plaintiff's disadvantage in violation of the **TRAVEL ACT**.

131. From 11/12/09 to present defendant Shuttlesworth knowingly devised a **WIRE FRAUD** scheme along with the other defendants and co- racketeers to use the interstate wires to defraud plaintiff to obtain property under false pretenses and by concealing material facts and then sharing/disseminating plaintiff's property ( business and personal information and her right to contract with whomever she wants to make a living and profit absent the racketeering and her right to file suits absent the racketeering ) to further the goal of the racketeering conspiracy.

132. While posing as a friend and business partner from 11/12/09 – 10/11 to plaintiff, she concealed the fact she was participating in the racketeering conspiracy to set plaintiff up through use of the wires. During 7/11 while plaintiff was at defendant Shuttlesworth's home, plaintiff told her about a case where the plaintiff had been set up by her roommate who was working with law enforcement to entrap her. Defendant Shuttlesworth specifically told plaintiff that plaintiff "did not have to worry about that with her"( her working against plaintiff with law enforcement ) but, defendant was working with her co-racketeers.

133. In addition from 11/12/09 to present defendant Shuttlesworth knowingly devised a scheme along with the other defendants and co- racketeers to use the wires to defraud plaintiff to obtain property under false pretenses by concealing material facts and then sharing/disseminating plaintiff's property to further the goal of the racketeering conspiracy by unlawfully recording phone conversations to extort information she wouldn't have gotten had plaintiff known she was working within the racketeering conspiracy and in person conversations during plaintiff's stay at her home to again extort information.

134. The in person conversation took place 10/7/11 or 10/8/11 at Shuttlesworth's home in the guest room plaintiff slept during her stay. The in person recorded conversation was about why defendant Shuttlesworth didn't tell plaintiff that the City Council Media Blitz. Defendant Shuttlesworth knew plaintiff couldn't afford to be caught up in any mess especially in the media.

135. Plaintiff later realized that the City Council media blitz was the defendants and the (non-party ) co-racketeers effort to further the racketeering by causing friction between she and defendant Shuttlesworth to hopefully cause an arrest to attempt to obtain plaintiff's freedom, make sure plaintiff's concert was a dead issue and they wanted to make sure plaintiff didn't connect with **Holder** who was speaking at the funeral and they also knew that creating the friction with defendant Shuttlesworth would mean the Cleveland concert was a dead issue. The founding Minister of the choir performing at the concert and selling tickets at their church is very well known in the Civil Rights Movement and was preaching Rev. Shuttlesworth's funeral.

136. Even with the recording/s between Shuttlesworth and plaintiff while plaintiff was in Birmingham the wires still crossed interstate boarders via the use of technology and other mechanisms used to transmit the communications.

39

137. Plaintiff didn't know that defendant Shuttlesworth had a phone that recorded which is what she used to record plaintiff in the room plaintiff slept to unlawfully obtain plaintiff's property ( strategy relative civil suit and other confidential business information)   when they were discussing the City Council Media blitz that plaintiff told her was going to cause problems for her concert and generating money for housing and other business projects. The Medi blitz actually turned out to be part of the defendants and co-racketeers  scheme to purposely cause havoc between plaintiff and defendant Shuttlesworth.

138. Plaintiff believes that the FBI records on Rev. Shuttlesworth will shed much more light on the role of all the racketeers including defendant Shuttlesworth's role IF the information isn't blacked out. There has been a serious effort to cover-up the racketeering conspiracy and the involvement of the racketeers especially Shuttlesworth and her step children.

139. From 11/12/09 to present Defendant Shuttlesworth conspired with the other defendants and the co-racketeer ( non-parties ) to illegally **EXTORT/ATTEMPT EXTORTION** to obtain plaintiff's property (confidential information) and or her legal property interest by employing racketeering acts causing plaintiff to fear physical and economic harm and or be falsely accused of a crime to induce and or attempt to induce plaintiff to part with her property and or legal property interest. Defendant Shuttlesworth, her co-defendants and co-racketeers knew plaintiff would never have parted with her property nor her property she had a legal property interest in, IF plaintiff had known that defendant Shuttlesworth was actually an undercover racketeer vs. the friend and business partner she falsely pretended to be.

40

140. Defendant Shuttlesworth, her co-defendants and the (non-party ) co-racketeers knew they weren't entitled to any of plaintiff's property under those false pretenses. As a result, interstate commerce was affected. Shuttlesworth, her co-defendants and the co-racketeers used plaintiff's property that was unlawfully obtained to try to make her go a different route with her business, entrap her to take her freedom, bring her business to a halt and discredit her as a Special Event Planner.

141. From 11/12/09 to present defendant Shuttlesworth with her co- defendants and (non party ) co-racketeers directly and or indirectly devised a scheme of Extortion/ Attempted Extortion to illegally obtain or caused to be illegally obtained plaintiff's property (1) confidential business information, (2) her legal property interest to make a living and profit through her Special Events Planning company absent the racketeering (3)  her right to hold all racketeers accountable in a legal suit absent the racketeering and traveled and or used facilities in interstate commerce to further/facilitating the racketeering conspiracy in violation of the **TRAVEL ACT** and then disseminating/sharing/using plaintiff's illegally obtained property to their advantage and plaintiff's disadvantage

142. From 3/7/12 – 3/14/12 defendant Gersh conspired with the other defendants and co-racketeers to knowingly devise a scheme of **WIRE FRAUD** to use the wires to defraud plaintiff and the Better Business Bureau in California to obtain plaintiff's property under false pretenses by concealing material facts to further the goal of the conspiracy. Plaintiff's business relationship with the bank was null and void as a result of the racketeering. Had the defendants not been illegally obtaining plaintiff's confidential business information, they would not have known plaintiff had something overdraft program. Plaintiff had no idea her account had the overdraft program until Gersh unlawfully obtained money from the account he knew from an email reply didn't have the monies available. Plaintiff was responsible for paying the money back to the bank.

41

143. On 3/14/12 Gersh told the Better Business Bureau that he'd spoken to plaintiff on 3/7/12 via phone and that plaintiff had given him permission on that day to withdraw over $500.00 ( Five Hundred Dollars ) from her business account. Gersh concealed the fact that he had not spoken to plaintiff on 3/7/12 and that plaintiff did not give him permission on that day nor any other day to make the withdrawal since plaintiff had told him she was in financial ruin and didn't have the money. The BBB believed Gersh even though Gersh had absolutely no proof he'd spoken to plaintiff on 3/7/12.

144. Defendant Gersh conspired with the defendants and other co-racketeers to in a **BANK FRAUD** scheme to further the conspiracy by means of false and fraudulent pretenses from a banking institution on 3/7/12 by falsely pretending that plaintiff had given him verbal permission on that day to withdraw over $500.00. Plaintiff did not speak to him on 3/7/12 authorizing the withdrawal because plaintiff did not have the money in her Bank One business account. Bank One does business in this jurisdiction as well.

145. Plaintiff hadn't spoken to Gersh by phone for some time. The only communications she'd had with him were via email each time telling him she had no money to pay the bill. The account did not have $500.00 in it for plaintiff to authorize him to make a withdrawal of that amount of money. Because Gersh was working with his co-racketeers, he had some inside information that plaintiff didn't have which was that plaintiff had some sort of overdraft on the account. It was very unusual for the bank to cover such a large amount on plaintiff's account.

146. Gersh knew that the bank would rely on him being honest when he used the wires to illegally make the withdrawal, damage another business relationship and obtain plaintiff's legal property interest to contract with whoever she wants absent the racketeering.

42

147. Since the defendants were directly and or indirectly through their co-racketeers taking control of plaintiff's identity ( passwords, logins accounts ) they were able to make anything happen. $500.00 was a huge amount for the bank to approve given the status of plaintiff's account.

148. The bank ended up closing plaintiff's business account because plaintiff refused to make the payment since plaintiff had not given Gersh permission to withdraw from an account that didn't have the money to pay him. Plaintiff was forced to have to find another bank to open a business account with even though her business account had been with Chase over 3 years.

149. On 3/7/12 – 3/14/12 defendant Gersh with his co- defendants and (non party ) co-racketeers directly and or indirectly devised a scheme in violation of the **TRAVEL ACT** to illegally obtain or cause to be illegally obtained plaintiff's property (1) over $500.00 out of her business account that did not have the money in it (2) her legal property interest not to have her business relationships damages and or otherwise obtained  (3)  her right to hold all racketeers accountable absent the racketeering and traveled and or used facilities in interstate commerce to further/facilitate the racketeering conspiracy by disseminating/sharing/using plaintiff's illegally obtained property to their advantage.

150. As a direct and proximate cause of the racketeering plaintiff's financial damages to her business and legal property interest are in excess of over $200,000 ( Two Hundred Thousand Dollars ) in financial losses in contracts, potential contracts  and prospective economic advantages. advantages/benefits. Plaintiff is entitled to triple her loss of her damages when proven, cost, interest and any reasonable Attorney Fees if plaintiff can find a lawyer to represent her business as an additional plaintiff

43

**RICO ACT VIOLATIONS – 18 USC 1962 (d) - ASSOCIATES IN FACT**

Maureen Faulkner, John McNesby, Chuck Canterbury, Sephira Shuttlesworth, David Gersh Unidentified TSA defendant doe and ( non-party participants ) Unknown FBI Agents, Unknown FOP Members, Unknown Other Supporting Union Members and Other Private individual co-racketeers

151. Plaintiff restates paragraphs 1-150 as though fully stated he

152. The defendants Faulkner, McNesby, Canterbury conspired with Shuttlesworth, Gersh, Unidentified TSA doe and the (non-party) co-racketeers conspired to conduct and or participate directly and or indirectly in the affairs of the enterprise through a pattern of racketeering as outlined in the previous paragraphs of this complaint, in violation of Section d.

153. Defendants Faulkner, McNesby and Canterbury conspired to further the scheme which if completed would make up all the elements for the RICO offense and adopted the goal of furthering and facilitating the racketeering scheme. The racketeering acts Faulkner, McNesby and Canterbury directly and or indirectly employed or caused to be employed from 11/12/09 to present through their co-defendants and (non-party ) co-racketeers included Wire Fraud, Identity Theft, Extortion, Attempted Extortion, Bank Fraud and Travel Act violations.

154. As a direct and proximate cause of the racketeering plaintiff's financial damages to her business and legal property interest are in excess of over $200,000 ( Two Hundred Thousand Dollars ) in financial losses in contracts, potential contracts  and prospective economic advantages. advantages/benefits. Plaintiff is entitled to triple her loss of her damages when proven, cost, interest and any reasonable Attorney Fees if plaintiff can find a lawyer to represent her business as an additional plaintiff.

44

## REGULAR WAY OF DOING BUSINESS

Faulkner, McNesby, Canterbury, (non-party) Unknown FBI Agents, FOP Union Members and Other Supporting Union Members

155. Plaintiff re-states paragraphs 1-154 as though fully stated herein.

156. Filmmaker Johanna Fernandez produced a film titled, " Justice on Trial." She tried to hire a PR firm to handle the public relations and also had people screen the film but, everyone was too fearful to help the flmmaker. Their position was " if we touch this, we'll never work again in Philadelphia." The Filmmaker had a property right not to have business relationships go down the drain absent the reign of fear and economic harm tactics and a right to contract with whoever she wanted absent the extortion.

157. Coors Brewing Company and Coca Cola Bottling of PA were also targeted by the FOP defendants and Faulkner directly and or indirectly through their co-racketeers. Officials from Coca Cola PA were rumored in police circles to be supporting Mumia. The fear tactics to damage the business and business relationships by using the wires to circulate false information is their regular of doing business.

158. Ironically before plaintiff was aware of the FOP issue with Coca Cola Bottling in PA, she had sought sponsorship from them for The Musical Tribute to MLK that she was planning in Philadelphia Plaintiff got a rejection letter 1/7/11.

45

159. In April 2007 an event, "Mumia 911" was planned for at a local NY club that was fine
with having his club used for the event. The FOP defendants and Faulkner directly and or indirectly
tried to force the club owner to change his mind. He wouldn't do so. The FOP then decided they'd use
a different method of force. They came up with all types of citations which resulted in thousands of
dollars. The club owner ended up canceling the event due to the fear tactics and extortion.

160. The FOP and supporting co-racketeers have used the wires in interstate commerce to coordinate
and rant and rave about their **racketeering** but, have since decided it wasn't in their best interest to
continue to use the wires to plot and rant and rave about how successful they were in demonstrating
their strength in numbers while carrying out racketeering acts.

161. If a business supports Mumia, they use the wires to plot attempting to make the owner reconsider
contracting with the planner and to shut the business down if he/she doesn't get their message (veiled
threats) by employing fear tactics, selective code enforcement which results in businesses not wanting
to be associated with anyone and any event/project with a Mumia tie. It's extortion. Then they use the
success of their fear tactics to boast about another win against Mumia supporters, solidify and increase
membership and maintain the code of silence/omerta about their racketeering employed.

162. In 1/1999 some Oakland High School teachers thought it would be a great idea to introduce
the case of Mumia to the students. The FOP defendants directly and or indirectly through their co-
racketeers sought to put a stop to it.

46

163. The Oakland police department spokesman demanded that the Teach Ins be banned because it conflicted with a date of the funeral of an Oakland policeman. Since the FOP defendants coupled with their union members and other supporting union members have instilled such fear in the public if they support anything and or anybody that supports Mumia they caused potential supporters to fear openly supporting the teach-in. Even teachers have a legal property interest in not having their business relationships damaged ( being forced out of their jobs and or forced not to participate in projects the want to ) just because they refuse they don't give into the extortion/attempted extortion .

164. The teach-ins still took place but the fear element halted the open and free support they otherwise would've. These are some of the same fear tactics they were employing against those that plaintiff was seeking support from for her events and projects. Nobody wants to be on the wrong side of the FOP members and the powers that be because its suicide for your business and not healthy.

165. 1/2012 a letter from the Philadelphia FOP McNesby sent to the Mayor with a veiled threat for him to reconsider his appointment of Sonia Sanchez as the Poet Laureate. The FOP is not happy with the appointment because of her association with someone convicted of killing a police officer. The wording of the letter is chilling as suggest in a chilling way that the FOP is not happy with his selection

166. 1/2012 a letter from the Philadelphia FOP President sent to the Mayor with a veiled threat for him to reconsider his appointment of Sonia Sanchez as the Poet Laureate. The FOP is not happy with the appointment because of her association with someone convicted of killing a police officer. The wording of the letter is chilling as it relates to the Mayor's job. It reeks of Gotti style tactics. Just one more instance of intimidation to attempt to obtain the legal property interest of the Mayor and Sonia Sanchez.

47

167. While this sort of letter would normally be considered protected by the first amendment, it's constructive to keep in mind that the racketeers who absolutely thirst for the blood of anyone that has been involved in the killing of a policeman or associates directly and or indirectly with anyone involved in the killing of a policeman, belong to a union that is infested by criminal elements nationwide who will not pause to carry out criminal acts openly and will maintain the code of silence about doing so because they know that the FOP defendant powers that be and the other executives will protect them at any cost and, they have Faulkner's blessing. This is how they obstruct justice.

168. April 2011 another veiled threat from the Philadelphia FOP. This time to the California Federation of Teachers. The PA FOP President warns that " it is clear you and your members need to disenfranchise yourselves from the snake oil salesmen" ( in part ) as it relates to Mumia support.

169. Such a communication coming from the head honcho of an organization that is infested with criminal elements who are protected by the executives within the FOP nationwide is quite chilling. The criminal elements have guns and badges, the power of the state and federal government behind them and the promise to maintain a code of silence with Faulkner's blessing. That's a sure recipe for a climate of fear and criminality.

170. 12/2011 Maureen Faulkner makes a personal plea to the First Responders Institute for them to call Philadelphia Governor Corbett to halt Mumia from speaking to his supporters who were gathered at a local Philadelphia venue. Mumia is allowed to make a phone call just like all the other prisoners but, she wants special conditions put on him to stop the communication. The First Responder Institute communication was via the internet and reaches First Responders nationwide.

48

171. IF plaintiff were to detail on a nationwide basis the racketeering acts the First Responders have been involved, it would take up a minimum of 5 pages. Plaintiff could list 200 of them from one city. Philadelphia has a huge history of racketeering going as far back as 10 years and nothing has changed. Waiting until August 2013 to call the DOJ in to once again look at the police department certainly misses the mark when the racketeering has been going on for so many years. In some of the states, the U.S. Attorney has had to intervene because of the level of corruption. This is the audience Faulkner was speaking to knowing they would employ criminal and violent acts and maintain the omerta ( code of silence) about it.

172. Faulkner was talking in code as her plea relates to the criminal elements within the FOP and other supporting unions. To the criminal elements, her plea was to go out and get even in the way you do and she knew that was how the criminal elements would take it. Faulkner's rallying of the troops are akin to Gotti having a telephone conference with the hitmen within his crew, in a nice monotone voice expressing his displeasure with a garmet worker complaining to the feds that he's being extorted. The conversation is simply conversation but, to the feds listening via wiretaps, it's a conversation in code to the group of hitmen at the meeting to carry out a criminal act to shut the garmet worker up.

173. It wasn't first amendment speech when Gotti expressed his displease about anyone to the hit at his gatherings. Gotti knew the power of his expressing his displeasure to a group of hitmen and he knew that they understood if he was not a happy camper with someone and was telling them about it, that meant to get rid of the problem. That's why the DOJ didn't entertain a first amendment argument.

174. In a letter to the President of the American Federation of Teachers dated 4/14/11 Canterbury request that the President on behalf of the organization " respectfully yet urgently request that you and the AFT publicly reject this repugnant resolution." The resolution he refers to is simply a resolution that California Teachers Association voted on to support Mumia getting a new trial.

49

175. Canterbury then goes on to falsely allege that Mumia " cynically directs them to raise money and stage benefits on his behalf. Using false and misleading information he has convinced many people and organizations that he, not Danny Faulkner and his widow is the victim of injustice. Nothing could be further from the truth." Plaintiff was not provided false and misleading information.

176. Canterbury's communication to the President of the organization was put online where the criminal elements within the FOP and supporting unions could get all wound up and incited to employ their criminal acts and create an atmosphere of fear. IF Canterbury were sending his communication out online to a group of individuals without the vast amount of criminal baggage his members have, one could more easily see the communication as being protected by the first amendment but, Canterbury's organization and the supporting unions ( LAPPL and fire unions etc. ) supporting the anti Mumia racketeering, have huge criminal baggage and mental health issues nationwide.

177. The FOP union members and their co-racketeers ( parties and non-parties ) have a very long history of working with other law enforcement agencies and recruiting private individuals within the Civil Rights Movement and outside of the movement to assist them in carrying out their racketeering. The assassination of Dr. King ( King vs. Jowers ), the framing of Geronimo Pratt ( Geronimo Pratt vs. FBI and City of Los Angeles ) are just a few examples. This time they used defendant Shuttlesworth as their secret weapon to assist in them in employing the criminal and violent acts against plaintiff.

178. The FBI documents that they have been reviewing to redact over 3 months since they notified plaintiff they found documents relative to her request during the years she was associated with Rev. Shuttlesworth and his family will shed or should shed more light on defendant Shuttlesworth and her step kids involvement in the conspiracy as well as information on the FBI's "continuing investigation" on plaintiff which plaintiff alleges had/has no legitimate law enforcement purpose. Plaintiff has been associated with Rev. Shuttlesworth and his family since 2006.

42 U.S.C. 1981

Unidentified Delta Does Defendants# 1- #2, Delta Airlines and co-conspirators Unidentified U.S. Airways Defendant Does , U.S. Airways defendants, Faulkner, McNesby, Canterbury, Shuttlesworth, Gersh, Unidentified Hilton Garden Inn Hotel Defendant Doe , Hilton Worldwide, Unidentified Holiday Inn Birmingham Airport Defendant Doe #6, Birmingham Airport Holiday Inn defendant, Unidentified TSA Defendant Doe and( non – party ) co-conspirators Unknown FBI Agents, Unknown FOP Members and Unknown Other Supporting Union and Private individuals

179. Plaintiff re -alleges paragraphs 1 -178 as though fully stated herein.

180. Delta Airline Doe Defendants agreed to conspire with the defendants and co-conspirators to intentionally discriminate against plaintiff because she is African American to violate her rights pursuant to 42 USC 1981.

181. 42 U.S.C. 1981 includes the right to make and enforce contracts including the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract. Plaintiff was denied her rights of the performance, the enjoyment of all benefits, privileges and terms and conditions of the contract and, plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens

182. The unidentified Delta doe defendants were discriminating against plaintiff because of her race and retaliating against plaintiff because of her First Amendment activity and conspired to do so to further the conspiracy.

51

183. Plaintiff was traveling to edit the MLK Assassination audiobook so she could make a living through her Special Events company by fulfilling contracts and pursuing potential contracts and prospective economic advantages absent all the defendants interference. To further the conspiracy the defendant does agreed with the co- defendants and the (non- party ) co-conspirators to cause havoc for plaintiff in an attempt to make plaintiff fearful of being accused of a crime and being falsely arrested and to taunt and otherwise make her uncomfortable.

184. As plaintiff was boarding the plane Delta defendant red jacket doe #1 was discussing plaintiff's housing situation with one of the ground crew. Plaintiff didn't know Delta defendant #1 red jacket doe and had never discussed her personal business with him but, he knew and was taunting plaintiff in hopes of causing a confrontation to have plaintiff arrested to take her freedom and deny her all the rights she's entitled to in her contract when she ticketed to fly. The (non-party) co-conspirators used the wires to communicate anything they wanted defendant conspirators and (non-party) co-conspirators to know about plaintiff even when it was private and something they shouldn't have known were it not for the unlawful obtaining and disseminating of information.

185. The issues with Delta employees started when plaintiff tried to check in at the Delta Kiosk to obtain her ticket. Even though plaintiff had a confirmation number and put it in, the computer would not show there was a ticket for plaintiff. Plaintiff was traveling on Rev. Shuttlesworth's miles from Birmingham to New Jersey to edit the MLK Assassination Trial audiobook and the ( non-party ) co-defendants were utilizing their expertise and resources to cause interference in any way they could via computer systems. Just like they did with the MLK Audiobook press release. They could make things happen and make it appear that it was just a random fluke.

52

186. Once plaintiff and two black males (one or two ) were walking to be seated and put up luggage, one of the white flight attendants told plaintiff and the black males that they'd have to check their luggage because there was no room in the bins. A white male passenger interjected that there was room and plaintiff and the black males put their luggage up on the plane. It was once again an effort to discriminate and start a confrontation with plaintiff.

187. Plaintiff didn't want to feed into their interference because the defendants were trying to cause a confrontation to prompt an arrest to take plaintiff's freedom and spin the Shuttlesworth mileage connection in to get a big news story but, plaintiff needed to try to make a living.

188. Once the plane arrived to Atlanta the unidentified white female Delta defendant doe#2 flight attendant took her finger and repeatedly jabbed plaintiff in her upper arm while she said "thank-you." Plaintiff never did acknowledge her thank- you's because plaintiff didn't think they were deserving.  It was a violent physical attack to start a confrontation to attempt to obtain plaintiff's freedom.

189. Rev. Shuttlesworth wasn't doing well and time was not on his side. What plaintiff didn't know then but, discovered after Shuttlesworth falsely accused her of possibly stealing the legal documents was, the defendants needed to make sure plaintiff was not at Rev. Shuttlesworth's funeral. **Holder** would be there and there was a movement under way to get **Holder** to look into Mumia's case <u>and</u> it turns out plaintiff was under some "continued investigation" from 2003 by the FBI which plaintiff alleges Holder authorized continuing <u>for no legitimate law enforcement purpose</u>. The defendants wanted to make sure plaintiff didn't connect with Holder so, they were trying hard to cause havoc.  The FBI also were maintaining records on Rev. Shuttlesworth until his death based on a FOIA plaintiff filed even though for years they denied having anything other than what was in the vault on him.

190. Plaintiff's contract with the airline did not include plaintiff being subjected to intentional discrimination and retaliation. Plaintiff did not hear the white male doe defendant discussing the personal business of the white passengers that boarded the plane. He didn't have a care in the world about doing so as plaintiff was in line waiting to pass him. The unconcern for the consequences was due to the fact that the Does were working with law enforcement and felt protected. It was false sense of security as no constitutional violation of discrimination and retaliation is protected even when conspiring with law enforcement.

191. Plaintiff did not see the female white doe defendant #2 physically jab any of the white passengers with her finger as they were getting off the plane as she gave her "thank-you's."

192. The Air Travel Consumer report reflects monthly complaints for Delta. It's not a good look. The FOP (non-party) co-conspirators have a long history of discrimination nationwide against blacks and their own black officers so, their marriage in a discriminatory retaliation conspiracy against plaintiff was the perfect fit for them. Delta has a long history of discrimination as well. Internal employee complaints and civil suits are also instructive on the white Delta employees discrimination towards minorities.

193. The right to make and enforce contracts includes the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract. Even though plaintiff was able to make the contract, defendants deprived plaintiff of her other rights under 42 U.S.C. 1981 (b). Plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens.

194. Plaintiff learned that defendant Faulkner is a former airline employee and that she has a slew of airline employee support for the anti Mumia campaign. The defendants directly and or indirectly through co-conspirators worked very long and hard to use their resources to recruit anyone they could to join their conspiracy against plaintiff. The Delta does #1 and #2 defendants are just a few that decided to join the conspiracy.

195. Unidentified Delta Airline doe defendants are agents of Delta Airlines who were at all times acting within the scope of their employment, their acts violated state law and are directly chargeable to defendant Delta Airlines.

196. Since plaintiff is alleging intentional discrimination acts carried out by Delta Airlines agents and not defendant Delta Airlines itself, defendant Delta Airlines is liable for the damages of its' agents caused to plaintiff pursuant to Respondeat Superior.

197. Defendant Delta Airlines is also liable under the Employer Indemnification Statute as the agents were acting within the scope of their employment when they committed the wrongs plaintiff has alleged herein.

198. Plaintiff was so upset with the treatment she experienced by the Delta doe defendants that she tried calling the Delta Corporate office to get someone from the executive offices on the phone but, Delta's phone system does not allow one to get to the executive offices.

199. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, taunting, fear, and anxiety. Plaintiff requests $ 600,000 ( Six Hundred Thousand Dollars ) compensatory damages, $1 Million ( One Million Dollars ) punitive damages, costs and interest jointly and severally.

55

42 U.S.C. 1981

Unidentified U.S. Airways Defendant Does #3, #4 and #5, U.S. Airways defendants and co-conspirators Unidentified Delta Airline Doe defendants, Delta Airlines defendants, Faulkner, McNesby, Canterbury, Shuttlesworth, Gersh, Unidentified Hilton Garden Inn Hotel Defendant Doe, Hilton Worldwide defendant , Unidentified Birmingham Airport Holiday Inn Defendant Doe, Birmingham Airport Holiday Inn defendant, Unidentified TSA Defendant Doe and ( non – party ) co-conspirators Unknown FBI Agents, Unknown FOP Members and Unknown Other Supporting Union and Private individuals

200. Plaintiff re-states paragraphs 1-199 as though fully stated herein.

201. Defendant U.S. Airways doe defendants #3-#4 agreed to conspire with the defendants and (non-party) co-conspirators to intentionally discriminate against plaintiff because she is African American to violate her rights pursuant to 42 USC 1981.

202. 42 U.S.C. 1981 includes the right to make and enforce contracts including the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract. Plaintiff was denied her rights of the performance, the enjoyment of all benefits, privileges and terms and conditions of the contract and plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens.

56

203. The unidentified U.S. Airways doe defendants #3-#4 were discriminating against plaintiff because of her race and retaliating against plaintiff because of her First Amendment activity and conspired to do so to further the conspiracy against plaintiff. Plaintiff was traveling to edit the MLK Assassination audiobook so she could make a living through her Special Events company by fulfilling Contracts, pursuing potential contracts and prospective economic advantages absent all the defendants interference.

204. Plaintiff flew out of the Fred Shuttlesworth airport in Birmingham, AL on her way to New Jersey to work on editing the MLK Assassination Trial audiobook. There was a stop-over in North Carolina from Birmingham, AL. To further the conspiracy, the defendant doe agreed with the co- defendants and the (non- party ) co-conspirators to cause havoc for plaintiff in an effort to cause plaintiff to fear being accused of a crime, to make plaintiff fearful for her personal property and her business and to make plaintiff's travel concerning and uncomfortable.

205. When plaintiff got to North Carolina and entered the airplane plaintiff's seat was taken by a Nigerian woman had 2 tickets with plaintiff's name on them. Plaintiff told the white female defendant flight attendant doe #3 about the issue. She asked the Nigerian lady for the tickets and id but, didn't seem real concerned even though plaintiff was which resulted in the white male defendant doe #4 gate attendant coming on the plane to ask for the tickets and id again. The lady had no id matching the tickets with plaintiff's name so, she left off the plane with doe #4 but, that didn't comport with 9/11 procedure and plaintiff knew it. Plaintiff went out to the gate area where defendant doe white female white gate attendant #5 was but she was simply unconcerned and blew plaintiff off saying the Nigerian lady was an employee and making a statement to the effect that it was that serious of an issue.

57

206. Defendants U.S. Airways does gate and flight attendants pretty much blew the issue off and came up with different stories when plaintiff inquired. They gave the impression that plaintiff was over reacting and just suggested that plaintiff just have a seat. Plaintiff asked for a beer to try to relax a little and the white flight attendant gave it to plaintiff but, she did so with a bit of an attitude because plaintiff was really concerned about where the Nigerian lady went and if anyone was going to stop her and find out who she was and how she had plaintiff's tickets. U.S. Airways white employees have a history of regarding discrimination against blacks and employ it as some sort of sport.

207. None of the white passengers where subjected to the defendants discrimination nor retaliation. There was no concern for following standard procedure because the defendants were so bent on furthering the conspiracy against plaintiff. If plaintiff had been white, blond and blue eyed plaintiff is pretty sure that they would've been extremely diligent in following 9/11 procedure. Even though plaintiff is black and struggling just to survive as a result of the conspiracy, plaintiff can't afford for her credit to be messed up anymore than it already by anyone especially someone that has isn't even held to give an explanation to plaintiff and law enforcement for what was going on who more than likely has contacts in Nigeria.

208. Plaintiff's contract with the airline didn't include plaintiff being subjected to intentional discrimination and retaliation. U.S. Airways agents has a horrible history of discrimination that is reflected in the Air Travel Consumer Report and a slew of internal complaints and civil suits including but not limited to  NAACP  vs. U.S. Airways. Plaintiff was traveling to edit the MLK Assassination Trial audiobook. The defendants and co-conspirators were using the wires to communicate plaintiff's travel information and anything else about plaintiff they wanted.

209. The right to make and enforce contracts includes the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract 42 U.S.C. (b). Even though plaintiff was able to make the contract, defendants deprived plaintiff of her other rights under 42 U.S.C. 1981 (b) Plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens.

210. Plaintiff learned that defendant Faulkner is a former airline employee that has a slew of airline employee support. The defendants and their co-conspirators have worked very long and hard to use their resources to recruit anyone they can to join their conspiracy against plaintiff and the U.S. Airways defendant does are just a few that decided to join the conspiracy.

211. Unidentified U.S. Airways doe defendants are agents of U. S. Airways who were at all times acting within the scope of their employment, their acts violated state law and are directly chargeable to defendant U.S. Airways under respondeat superior. Pursuant to common law, defendant U.S. Airways is also responsible for indemnifying the defendants for the unlawful acts.

212. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, and anxiety Plaintiff requests $600,000 ( Six Hundred Thousand Dollars) in compensatory damages and $1 Million in punitive damages ( One Million Dollars ), costs and interest.

42 U.S.C. 1981

Unidentified Hilton Garden Inn Defendant Doe #5, Hilton Worldwide defendant and co-conspirators Unidentified Delta Airline Doe defendants, Delta Airlines defendants, Unidentified U.S. Airways Defendant Does, U.S. Airways defendants, Faulkner, McNesby, Canterbury, Shuttlesworth, Gersh, Unidentified Birmingham Airport Holiday Inn Defendant Doe, Birmingham Airport Holiday Inn defendant, Unidentified TSA Defendant Doe and ( non – party ) co-conspirators Unknown FBI Agents, Unknown FOP Members and Unknown Other Supporting Union and Private individuals

213. Plaintiff re-states paragraphs 1-212 as though fully stated herein.

214. Unidentified Hilton Garden Inn doe defendant#5 agreed to conspire with the defendants and co-conspirators to intentionally discriminate against plaintiff because she is African American to violate her rights pursuant to 42 USC 1981.

215. 42 U.S.C. 1981 includes the right to make and enforce contracts including the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract. Plaintiff was denied her rights of the performance, the enjoyment of all benefits, privileges and terms and conditions of the contract and plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens

60

216. The unidentified Hilton Garden defendant doe and co-conspirators were discriminating against
plaintiff because of her race and retaliating against plaintiff because of her First Amendment activity
and conspired to do so to further the conspiracy while taunting plaintiff as the City Council plot that the
defendants created had tied plaintiff's name into as well and now plaintiff had been escorted to the
hotel by Birmingham police after Shuttlesworth had plaintiff escorted out of her home in an effort to
cause an arrest after she falsely accused plaintiff of possibly stealing legal documents once plaintiff
outlined the finer points of how the City Council media blitz would create problems for plaintiff's
concert and the liability Shuttlesworth could face from everyone that was now tied into the mess.

217. Plaintiff in Birmingham working on production for her Cleveland concert, the Troy Davis
audiobook and her festival and traveling from Birmingham to NJ to edit the MLK Assassination
audiobook so she could make a living through her Special Events company by fulfilling contracts
and pursuing potential contracts and prospective economic advantages absent all the defendants
interference. Plaintiff had no money for housing and was at the Shuttlesworth's home for 3 months.

218. To further the conspiracy the defendant doe agreed with the co- defendants and the (non- party )
co-conspirators to taunt and harass plaintiff by referring to plaintiff as "transit" and "sweetie" Plaintiff
asked her to stop calling her "sweetie" but she continued to do it and thought it was funny. She was
trying to create a confrontation to cause an arrest. Shuttlesworth falsely accusing plaintiff of possibly
stealing legal documents didn't accomplish an arrest so, they were trying a different angle. Plaintiff
was in a very vulnerable spot not knowing where she'd get housing and having no money thanks to the
defendants conspiracy.

219. The FBI documents may shed much more light on the conspiracy since the documents they turned
over to plaintiff in 5/2013 indicate "investigation continues" as it relates to plaintiff and in late 2012 the
FBI FOIA indicates they have records on Rev. Shuttlesworth while plaintiff was associated with him
and his family.                                                   61

220. The Manager on duty called plaintiff in her room acting as if plaintiff were the problem after The white female defendant doe called plaintiff "sweetie" right in from of the black male manager on duty. Plaintiff told him that she didn't appreciate it and had told the defendant doe about it previously. He didn't seem to take it seriously at all and moved onto the next subject matter even though plaintiff asked him if he would do something about it. He said he'd talk to her later but, the damage had been done already.

221. Plaintiff had asked doe defendant to give her the big box that was right in front of her that contained the audiobook cases defendant Shuttlesworth had dropped off at the hotel after she'd falsely accused plaintiff of "possibly stealing" the legal documents in an attempt to cause an arrest. Defendant doe was looking dead at the box but pretended not to see it, simply to cause a confrontation.

222. A white male unknown co-conspirator walked up and said " you're just trying to create trouble" or something to that effect. Plaintiff asked the legal department to pull and maintain the film.

223. Plaintiff did not see any of the white guests treated in the discriminatory manner she was and the fact that Shuttlesworth was in on the conspiracy along with state and federal actors gave the defendant doe and co-conspirators in each state the impression that they were above the law.

224. The defendants have worked very long and hard to use their resources to recruit anyone they can to join their conspiracy against plaintiff and the Birmingham Hilton Garden defendant and co-conspirators are just a few that decided to join the conspiracy. There seemed to be this united front that just because plaintiff had a Shuttlesworth connection didn't mean that they were going to change their ways as it related to plaintiff, and defendant Shuttlesworth was in on it.

62

225. The right to make and enforce contracts includes the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract 42 U.S.C. (b). Even though plaintiff was able to make the contract, defendants deprived plaintiff of her other rights under 42 U.S.C. 1981 (b). Plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens. Defendant Birmingham Hilton Doe was acting within the scope of her duties as an agents of the Hilton so, defendant Hilton is liable under Respondeat Superior and the Employer Indemnification statute.

226. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, anxiety and taunting. Plaintiff request $600,000 ( Six Hundred Thousand Dollars ) in compensatory damages, $1 Million ( One Million Dollars ) in punitive damages, costs and interest.

## 42 U.S.C. 1981

Unidentified Holiday Inn Airport- Birmingham Defendant Doe #6, Holiday Inn Airport – Birmingham Defendant and co-conspirators Unidentified Delta Airline Doe defendants, Delta Airlines defendants, Unidentified U.S. Airways Defendant Does, U.S. Airways defendants, Faulkner, McNesby, Canterbury, Shuttlesworth, Gersh, Unidentified Hilton Garden Inn Hotel Defendant Doe, Unidentified TSA Defendant Doe and( non – party ) co-conspirators Unknown FBI Agents, Unknown FOP Members and Unknown Other Supporting Union and Private individuals

227. Plaintiff re-states paragraphs 1- 226 as though fully stated herein.

63

228. Unidentified defendant Holiday Inn Birmingham Airport Doe Defendants #5 agreed to conspire with the defendants and co-conspirators to intentionally discriminate against plaintiff because she is African American to violate her rights pursuant to 42 USC 1981. 42 U.S.C. 1981 includes the right to make and enforce contracts including the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract.

229. Plaintiff was denied her rights of the performance, the enjoyment of all benefits, privileges and terms and conditions of the contract and plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens

230. The unidentified Holiday Inn defendant doe and co-conspirators were discriminating against plaintiff because of her race and retaliating against plaintiff because of her First Amendment activity and conspired to do so to further the conspiracy.

231. To further the conspiracy the defendant doe agreed with the co- defendants and the (non- party ) co-conspirators to directly and or indirectly cause plaintiff to be subjected being concerned about her privacy and security in the hotel room/s and being subjected to the amenities in her room being interfered with so that her use of them were affected adversely. When plaintiff moved to another room the amenities in the new room were also interfered with. It was a pattern of the defendants and co-conspirators to further the conspiracy in various states. With technology these days, one does not have to physically enter the dwelling interfere with amenities that allow them unlawfully view and listen to what's going on in a dwelling it can be done right through telephone and or cable wires for the t.v.

64

232. The tv in the first room was interfered with which resulted in plaintiff calling the front desk to have someone come up to fix it after she returned from breakfast. Interfering with amenities was pretext to have access to the room. Plaintiff came back from breakfast and was shocked to find a white male with a big grin on his face over by her bed standing. He didn't have on a uniform nor badge and said he was there to fix the tv.

233. Plaintiff was in tears after she got him out of the room. Plaintiff was moved to another room. The tv in that room was interfered with. The telephone in the room was interfered with as well and the hotel was frequented by Birmingham police on the floors where guests stay but, they weren't there on business. The fire department swarmed around the hotel with constant siren emergencies during plaintiff's stay as well. The fire department in Birmingham has a history of using their sirens to fake emergencies against Rev. Shuttlesworth but, it's a very known stalking, harassing and extortion tactic that has been used against those in the civil rights movement for years and it's also used constantly to harass those that live in poor areas.

234. This was once again an effort to demonstrate that the Shuttlesworth connection wouldn't change their ways. Plaintiff had not even mentioned anything to anyone about the Shuttlesworth connection though but, plaintiff had been pulled into the City Council media plot that was in the news and of course plaintiff had been escorted out of the Shuttlesworth home by Birmingham police but, prior to that, there were all the other discriminatory and retaliation acts as well.

65

235. None of the white guests at the hotel were treated in the discriminatory manner plaintiff was at the hotel. The right to make and enforce contracts includes the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges and terms and conditions of the contract 42 U.S.C. (b). Even though plaintiff was able to make the contract, defendants deprived plaintiff of her other rights under 42 U.S.C. 1981 (b). Plaintiff was also deprived of " the full and equal benefit of the laws and proceedings for security of persons and property as enjoyed by white citizens.

236. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, anxiety of being subjected to the taunting, retaliation and being targeted by the conspiracy. Plaintiff request $600,000 ( Six Hundred Thousand Dollars ) in compensatory damages and $ 1Million ( One Million Dollars ) in punitive damages, costs and interest.

## 42 USC 1985 (3)

Faulkner, McNesby, Canterbury, Shuttlesworth, Massengill, Gersh, Unidentified Hilton Garden Inn Hotel doe, Unidentified Birmingham Airport Holiday Inn Defendant Doe, and ( non – party ) co-conspirators Unknown FBI Agents/National JTTF, Unknown FOP Members and Unknown Other Supporting Union and Unknown Private individuals

237. Plaintiff re-alleges paragraphs 1-236 as though fully state herein.

238. From 9/30/11 to present defendants agreed to conspire together to intentionally deprive plaintiff of her right to equal privileges and immunities provided under the laws and equal protection under the law because plaintiff is African American and they opposed her first amendment activity and associations even though she is a free African American pursuant to the 13th Amendment. Defendants and their co-conspirators employed and carried out their discrimination and retaliation through a pattern of force, violence and fear tactics. 66

239. Plaintiff's right to enjoy places of public accommodations and all the benefits her hotel contracts included were violated. Plaintiff's rights to travel freely from state to state was violated. Plaintiff's rights as a free African American to take advantage of the same rights whites have were violated.

240. The defendants directly and or indirectly through their (non-party ) co-conspirators even unlawfully taunted and otherwise attempted to anger plaintiff to entrap plaintiff into committing crimes so they could obtain her freedom, damaged property in hotel rooms plaintiff stayed, caused plaintiff to be subjected to discrimination, retaliation and harassment at hotels and in airports by hotel staff and unknown ( non-party ) co-conspirators, caused plaintiff to be subjected to discrimination, retaliation and harassment by airline personnel even though plaintiff is a free citizen.

241. To top all that off, the defendants and the (non-party) co- conspirators conspired to cover up the conspiracy and their involvement. Plaintiff alleges that the FBI documents will reveal the extent of the defendants involvement but, there has been such an effort to cover up the documents and keep plaintiff from exposing them because as plaintiff alleges that defendant Shuttlesworth and Massengill were working with the defendants and (non-party ) co-conspirators.

242 . The defendants and the co-conspirators had failed to entrap plaintiff into doing anything for them to accomplish the false arrest they were trying to secure of plaintiff with the City Council Media blitz scheme so, they kept trying with the hotel and airport plots to further the conspiracy.

243. Defendants directly and or indirectly through their (non-party) co-conspirators also attempted to discredit plaintiff as a Special Event Planner and personally discredit plaintiff by using the wires disseminate false information painting plaintiff as some sort of security threat to airport, airline and hotel personnel state to state.

67

244. Defendant Shuttlesworth and her step daughter Pat Massengill were used to the fullest extent to help further the conspiracy alleged throughout this complaint which included but was not limited to the Birmingham City Council media blitz scheme to keep plaintiff from connecting to **Holder** who was speaking at Rev. Shuttlesworth's funeral. There was a movement under way to have Holder open an investigation into Mumia's case and the defendants didn't want to chance plaintiff broaching the subject with him at the funeral.

245. In late 2012 the FBI produced a response to a FOIA request plaintiff filed for records on Rev. Fred Shuttlesworth during the years plaintiff was associated with him and his family. They'd been telling the public for years everything they had on him was in the vault from his previous very active years in the Civil Rights Movement.

246. All that plaintiff experienced as alleged throughout this complaint felt and looked a lot like the history of the FBI joining forces with other federal and state agents and private individuals during the Co-intelpro program. Only this time under a different program with the National JTTF, the defendants and the unknown (non-party) co-conspirators. In addition, in 5/13 the FBI turned over to plaintiff via a FOIA request the records indicated " investigation continues" on plaintiff.

247. HOLDER spoke at the funeral of Rev. Shuttlesworth's funeral even though the FBI was maintaining records on Rev. Shuttlesworth during the years plaintiff was associated with him until his death ( based on a FOIA ). The FBI alleges they are still reviewing the records to see if anything needs to be redacted. Plaintiff alleges that they are still trying continuing to cover-up the conspiracy because it doesn't take over 3 months for legal staff to know what's applicable to an exemption and what's not.

68

248. Defendant Massengill was the source to spark the 9/30/11 City Council Media blitz scheme. It was the defendants and (non-party ) co-conspirators scheme to create a rift between plaintiff and defendant Shuttlesworth to keep plaintiff away from the funeral. None of the defendants wanted plaintiff publicly associated with Rev. Shuttlesworth. The (non-party ) co-conspirator friendly media source purposely used a 2008 newspaper article where defendant Shuttlesworth needlessly mentions plaintiff's name in a 2008 business venture.

249. There were so many other articles from 2008 on the same issue that **did not** include plaintiff's name but, the defendants and (non-party) co-conspirators wanted to make sure the rift between plaintiff and defendant Shuttlesworth was firmly in place. That did it. It resulted in plaintiff having to have a talk with defendant Shuttlesworth on the problems the City Council Media blitz (scheme ) would cause for her Cleveland concert and subsequent events and money for housing which resulted in Shuttlesworth leaving her home and coming back a few days later with police. Classic-cointel pro set up.

250. On 9/30/11 defendant Pat Massengill's ranting and raving to the media forced City Council to answer to the public for donating to the Fred Shuttlesworth Foundation. The residents were questioning the donation but, the City Council Media blitz was a plot to cause the rift between Shuttlesworth and plaintiff as none of the defendants other plots to cause an arrest had worked.

251. Plaintiff only found out her name was involved in the City Council Media blitz (scheme) when she looked in the paper at the copy shop after defendant Shuttlesworth dropped plaintiff off to purchase a new phone because plaintiff's phone had all of a sudden just stopped working. That too was part of the defendants conspiracy. They used every trick in the book to cause havoc .

252. When plaintiff got to the copy shop, there was a white guy dodging in between a pick -up truck in a very obvious manner, like he wanted plaintiff to see him doing it. Based on information and belief, the white male appears to be a newspaper reporter from the local paper that ran the City Council Media blitz in Birmingham.

253. Plaintiff's phone wouldn't charge or anything but, the defendants have ways to make all sorts of strange things happen. Just like they did or caused to be done, with the MLK Audiobook press release. The defendants directly and or indirectly sent or caused to be sent via their (non-party ) co-on 9/30/11. It was photo of a vacant street to insinuate that plaintiff would be out on the street in short order. Plaintiff showed it to defendant Shuttlesworth, she had no comment. The defendants directly and or indirectly sent or caused to be sent another offensive photo email on 10/2/11 with an offensive sexual context. All of this right when plaintiff was dealing with the media blitz scheme.

254. Plaintiff asked defendant Shuttlesworth why she didn't tell plaintiff her that her name was caught up in the mess. Shuttlesworth claimed she didn't know plaintiff's name was included in the press for the City Council Media Blitz (scheme). That was another one of her false statements to cover-up for her involvement in the conspiracy. Reporters had been calling her about the City Council media blitz and she was taking their calls.

255. Plaintiff had a calm cool and collective conversation with defendant Shuttlesworth regarding the issues her concert and other projects faced as a result of the City Council media blitz (scheme ). The conversation took place in the guest room plaintiff slept during her stay there. Plaintiff noticed defendant Shuttlesworth holding her phone but, plaintiff didn't know that it was capable of recording nor did plaintiff know that defendant Shuttlesworth was recording the conversation or was causing it to be recorded.

70

256. Plaintiff sent a follow up email that same night to defendant Shuttlesworth but, the first email never came back to plaintiff even though she c.c'd herself ( part of the conspiracy was interfering with the computer ) so, plaintiff ended up sending over a condensed version of what she'd said in the first email.

257. The Birmingham police officer that Shuttlesworth brought to her home to escort plaintiff out was talking to someone on his cell phone that was giving him instructions as he watched over plaintiff packing. Defendant Shuttlesworth falsely accused plaintiff of possibly stealing the legal documents right in front of the Birmingham police officer D. Carter. It was an effort to entrap plaintiff to secure that arrest they'd been trying to get. That way plaintiff would not be at the funeral and there would be no way plaintiff would ever have the Shuttlesworth name involved with any of her events/projects.

258. When plaintiff sought records regarding Officer D. Carter coming to Shuttlesworth's home to escort plaintiff out, there was no response at all even though plaintiff sent the request certified mail and the police response records are public records. There was no response even denying the records based on any alleged exemption either. It was a deliberate effort to cover-up their involvement and that of defendants Shuttlesworth and Massengill's involvement in the conspiracy.

259. The white male in the trench coat at the Birmingham Hilton Garden Inn that attempted to start a confrontation with plaintiff who appeared to be with law enforcement may very well have been with the federal or Joint Task Force law enforcement unit. Since the FBI has come clean now that it was obtaining records on Rev. Shuttlesworth during plaintiff's association with him and his family up to his death and that plaintiff is under some alleged " continuing investigation."

71

260. Alabama and Philadelphia are the founding cities for the anti-Mumia effort so, all that plaintiff experienced considering their serious fear of Rev. Shuttlesworth's, name, image etc. being involved, demonstrates the extremes they go to just to demonstrate their strength in numbers. The (non-party) union members and supporting union members in both states/cities have a long history of discrimination against blacks.

261. Out of all the civil rights widows and family members, defendant Shuttlesworth and Massengill are the only ones that had law enforcement marching down the street with the casket of a Civil Rights Icon. Mrs. King and Mrs. Evers knew faces had changed within law enforcement departments but, history hadn't changed that much. It was an effort to demonstrate their partnership in the conspiracy.

262. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, anxiety of being subjected to the discrimination taunting, retaliation and being targeted by the conspiracy. Plaintiff request $365,000 ( Three Sixty Five Thousand Dollars ) in compensatory damages and $3 Million Dollars ( Three Million Dollars ) in punitive damages, costs and interest.

42 U.S.C. 1986

( Cover Up of Continuing Conspiracy )

Faulkner, McNesby, Canterbury, Shuttlesworth, Massengill, Gersh, Unidentified Delta Airline Doe defendants, Unidentified U.S. Airways Defendant Does, Unidentified Hilton Garden Inn Hotel Defendant Doe, Unidentified Birmingham Airport Holiday Inn Defendant Doe, Unidentified TSA Defendant Doe and ( non – party ) co-conspirators Unknown FBI Agents, Unknown FOP Members and Unknown Other Supporting Union and Unknown Private individuals

263. Plaintiff re-alleges paragraphs 1-262 as though fully stated herein.

72

264. Defendants had actual knowledge of the conspiracy and cover-up of the conspiracy, they each had the power to prevent or aid in preventing the conspiracy, the defendants neglected and or refused to prevent the conspiracy which resulted in plaintiff being violated.

265. The continuing cover-up included the defendants pointing the finger at plaintiff being responsible for all her problems at the hotels, at airports, with airline personnel and the interference with her contracts.

266. Plaintiff's right to enjoy places of public accommodations and benefits from all her contracts included was violated. Plaintiff's right to travel freely absent the conspiracy was violated and plaintiff's right to be free from the retaliation, discrimination and the conspiracy itself, were violated.

267. Plaintiff suffered anxiety, frustration, humiliation, embarrassment and fear. Plaintiff request damages for **all** the wrongs allowed pursuant to 42 USC 1986 against each of the defendants that could've stopped the conspiracy but simply wouldn't do so.

## BIVENS CLAIM – HOLDER

268. Plaintiff re-states paragraphs 1-267 as though fully stated herein.

269. From 9/30/11 to present defendant Holder conspired with the other defendant co-conspirators to intentionally deprive plaintiff of her right to equal privileges and immunities provided under the laws and equal protection under the law because plaintiff is African American and they opposed her first amendment activity and associations even though she is a free African American pursuant to the 13th Amendment.

73

270. Based on information and belief, when defendant Holder took office he was briefed on the current national open and continuing investigations the FBI was involved.

271. The FBI/JTTF in 2003 contacted plaintiff via phone saying they had a subpoena to speak to her about the murder but, they never produced the subpoena to the lawyer plaintiff told them to contact on her behalf. They came to plaintiff's job without the subpoena so, plaintiff wouldn't talk to them and they still never produced a subpoena to the lawyer plaintiff told them to contact so, plaintiff was quite shocked to learn in 5/13 via a FOIA request she filed that there is a "continuing investigation" of plaintiff. The FBI did not provide any documents indicating the investigation was closed relative to plaintiff even though plaintiff had nothing to do with it and didn't know the white man that was the culprit who is no longer among the living. He killed himself right after the crime.

272. Plaintiff was one of many individuals that appeared before the judge about 8 years prior to the crime. A newspaper article said the JTTF/FBI were looking into various cases the judge had previously handled but, once again the JTTF/FBI never produced a subpoena nor did they ever contact the lawyer regarding speaking to plaintiff on the crime that was investigated nationally.

273. Based on information and belief, Holder authorized a "continuing investigation" of plaintiff for no legitimate law enforcement purpose and was participating in the cover-up of the conspiracy. At this rate, plaintiff will be under a cloud of unlawful eyes and ears until her death no matter what state she travels to. Plaintiff's first amendment activity and associations are the reason plaintiff has been subjected to the defendants multi-state conspiracy.

74

274. Had plaintiff gone to the funeral it's not likely that plaintiff would've been able to speak to him as he more than likely would have been surrounded by security that wouldn't have allowed plaintiff to even speak to him. It is highly possible that someone else at the funeral may have been able to get plaintiff in to see Holder or to speak with him regarding looking into Mumia's case and plaintiff didn't learn about the "continuing investigation" records on her nor the records on Rev. Shuttlesworth until after the City Council Media plot to keep plaintiff away from Holder at the funeral.

275. Plaintiff had a legal right to be free from being under some umbrella of a "continuing investigation" cloud of suspicion each year for no legitimate law enforcement purpose. It's such an offensive and intimidating position to approve just because of their first amendment activity and associations and then to participate in a cover-up just makes matters far worse.

276. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, anxiety of being subjected to the taunting, retaliation and being targeted by the conspiracy. In addition plaintiff's trust level of the DOJ is on a scale of 1-10, at a very low level 1. Plaintiff no longer wants to work in the Law Enforcement Corruption Unit of any U.S. Attorney's office as a result. Plaintiff request $365,000 ( Three Hundred Sixty Five Thousand Dollars ) in compensatory damages and $3 Million (Three Million Dollars ) in punitive damages, costs and interest.

## 42 U.S.C. 1983

Faulkner, McNesby, Canterbury, Shuttlesworth, Massengill, Gersh, Unidentified Delta Airline Doe defendants, Unidentified U.S. Airways Defendant Does, Unidentified Hilton Garden Inn Hotel Defendant Doe, Unidentified Birmingham Airport Holiday Inn Defendant Doe, Unidentified TSA Defendant Doe  and ( non – party ) co-conspirators Unknown FBI Agents, Unknown FOP Members and Unknown Other Supporting Union members and Unknown Private individuals and ( non-party ) Birmingham Police Officer D. Carter                    75

277. Plaintiff re-states paragraphs 1- 276 as though fully stated herein.

278. On 9/30/11 the defendants conspired to create havoc between plaintiff and defendant Shuttlesworth in hopes of obtaining a false arrest to keep plaintiff from attending the funeral of Rev. Fred Shuttlesworth so that plaintiff would not connect with HOLDER, to interfere with and otherwise damage the projects and events plaintiff was producing through her Special Events Planning Company, to damage plaintiff's business relationships and to cause plaintiff physical and economic harm.

279. The defendants opposed plaintiff's legally protected first amendment activity and her associations fearing that plaintiff would use profits and contacts to benefit Mumia's legal defense fund. Plaintiff had planned to contribute to Mumia's legal defense fund whenever one of her events allowed her to.

280. There was a nationwide hatred among the law enforcement, fire community lead by Faulkner and joined by any private individuals they were able to get to get on the bandwagon.

281. The defendants had a huge fear that plaintiff would tie Rev. Fred Shuttlesworth's name and or him personally into her events/projects and that a benefit would go to Mumia as a result. Now that plaintiff knows about the FBI records on Rev. Shuttlesworth during plaintiff's association with him and his family, the FBI records may reflect that they heard a phone conversation plaintiff and Rev. Shuttlesworth had where he said Mumia should "get a new trial."

282. Defendant Shuttlesworth also knew that Rev. Shuttlesworth felt that way as well but, plaintiff had no idea until her visit to Birmingham that defendant Shuttlesworth didn't really want her husband publicly involved with plaintiff nor her events because of plaintiff's association with Mumia. Same thing with Rev. Shuttlesworth's kids including defendant Massengill.

283. The City Council Media blitz that Massengill was the point person on, was a **plot** to further the conspiracy but, plaintiff did not buy into doing anything that would cause the arrest the defendants were trying to obtain when (non-party) Birmingham Police officer D. Carter came with Shuttlesworth to her home and escorted plaintiff out AFTER defendants Shuttlesworth **falsely** accused plaintiff of possibly stealing the legal documents she'd taken plaintiff to make and directing plaintiff to turn the documents over to her including the copies she knew plaintiff had made for herself.

284. The copies Shuttlesworth knew plaintiff had made for herself were at that time plaintiff's property but, out of fear of the false arrest, plaintiff turned the copies as well as the originals over. Shuttlesworth knew plaintiff had the originals and copies. Plaintiff was only privy to the Shuttlesworth legal matters because defendant Shuttlesworth shared the information. Plaintiff on various occasions contacted lawyers on behalf of defendant Shuttlesworth and always c.c'd her on the email so, defendant Shuttlesworth knew plaintiff hadn't possibly stolen anything from her because legal stuff was always openly shared with plaintiff.

285. Plaintiff had no idea that defendant Shuttlesworth sharing the legal information was the defendants plot to set plaintiff up for a false arrest that they hadn't been able to accomplish during any of the other points of the conspiracy.

286. The conspiracy spanned from state to state and all the defendants were acting under color of state law as state actors in their joint effort with officer D. Carter.

287. There were a slew of fire emergencies while plaintiff was at the Birmingham Holiday Inn but, one of the discrimination and retaliatory tactics the fire department in Birmingham had a history of using against Rev. Shuttlesworth was, to pretend they were going to real emergencies when in fact they were only using city resources and their positions to retaliate and harass him and those involved with him.

77

288. Plaintiff alleges the routine fire emergencies around the Birmingham Holiday Inn hotel during her were only a part of the defendants nationwide state to state discrimination and retaliation effort against plaintiff. The police also frequented the hotel some coming up on the floors of the hotel even though not for any official police business. The same thing happen in various states plaintiff traveled. There was a police and fire presence to retaliate and harass.

289. Plaintiff couldn't pay her rent for her business and ended up getting legal documents from a lawyer that was suing plaintiff for the rent, couldn't pay a $400.00 past due bill at her college which was required in order for the college to release the official copy of plaintiff's transcript to the law school plaintiff could've started, couldn't pay the $1,600 needed to get into a paralegal program provided plaintiff could get the $5,000 grant.

290. Plaintiff couldn't pay the rent for housing in Los Angeles, CA that plaintiff had sought to get into and was still available but plaintiff had no money for housing even though she had contracts and potential contracts that would have paid for it were it not for the conspiracy, plaintiff's business came to a standstill because plaintiff couldn't fulfill contracts, potential contracts nor take advantage of prospective economic benefits, plaintiff couldn't pay for dental work the was $40,000 resulting from a previous dental procedure nightmare and plaintiff couldn't pay other bills associated with her business.

291. Instead of concentrating on making a living and profit through her business where she could pay bills associated with her business and personal bills plaintiff was forced to spend countless hours doing legal research and typing up a complaint and trying to get around the defendants conspiracy so she could hold them accountable in court absent the racketeering/conspiracy. Plaintiff was also forced to spend time having to look for a job working for someone else doing something jobs way outside of the realm of her Special Events Planning.

292. Plaintiff wasn't supposed to be looking for a job nor was plaintiff suppose to be trying to get money for housing, looking for jobs because plaintiff had a job with her Special Events Planning Company but the defendants were working overtime to ruin contracts, potential contracts and prospective economic advantages and actually did so.

293. Plaintiff was reminded over and over that she needed money for housing, money for transcripts, money for books, money to pay bills for her business Plaintiff had to worry about how she'd have money to make copies and to mail documents for this civil suit how she'd even be able to pay for all things associated with filing a civil suit. Plaintiff wasn't supposed to be put in situations that caused her to be fearful of physical and or economic harm but, that's where the conspiracy landed plaintiff.

294. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, anxiety of being subjected to the taunting, retaliation and being targeted by the conspiracy. Plaintiff request $365,000 ( Three Hundred Sixty Five Thousand Dollars ) in compensatory damages and $3 Million ( Three Million Dollars ) in punitive damages, costs and interests jointly and severally against all defendants.

### CONSPIRACY TO BREED and COVER-UP CODE OF SILENCE among Philadelphia FOP Members and FOP Members Nationwide

( Philadelphia FOP#5, National FOP, Canterbury, McNesby in their official capacities and Faulkner )

295. Plaintiff re-states paragraphs 1-294 as though fully stated herein.

79

296. Defendants McNesby, Canterbury and Faulkner agreed to conspire to breed and cover-up the code of silence within the Philadelphia FOP and the FOP members nationwide which resulted in plaintiff being violated as alleged throughout this complaint.

297. Philadelphia and Alabama are the nucleus for the anti Mumia movement but, it is joined by the various FOP lodges, other police unions ( Los Angeles Police Protective League etc. ) fire unions and private parties nationwide.

298. The problem is that the FOP nationwide is infested with criminal elements which resulted in criminal and violent acts being employed through a pattern of racketeering to cause damage to plaintiff in her business and legal property interest, plaintiff's right to enjoy places of public accommodations and all the benefits her contracts included, plaintiff's right to travel freely and benefit from all her contract with the airline included, plaintiff's right to be free from the retaliation, discrimination and the conspiracy itself.

299. Plaintiff was being violated because the defendants and the (non-party) co-conspirators disagreed with her First Amendment activity and associations. They feared that plaintiff would use money from her business and her contacts to benefit Mumia Abu Jamal legal defense fund, which plaintiff had planned to do when one of her projects/events allowed. The defendants and the (non-party) co-conspirators greatly feared plaintiff connecting Rev. Fred Shuttlesworth to her events/projects and told plaintiff that Mumia should get a new trial.

300. The FOP criminal elements welcomed into the FOP Lodges have a severe hatred for Mumia and his supporters. Faulkner, McNesby and Canterbury know the criminal elements will do anything to get even including employing violent and criminal acts.

301. Getting even is what Faulkner, McNesby and Canterbury wanted from the criminal elements which is why they were coordinating, sponsoring, supervising and authorizing the unlawful acts that were directed towards the criminal elements in code to act out criminally and maintain the code of silence about doing so.

302. IF plaintiff were to have to provide a list of the racketeering acts the FOP members in various states have been involved, it would total over 100 pages. In one city alone just the (non-party) supporting fire union members include 200 members with criminal backgrounds but, the criminal records of the police in that city are just as bad.

303. Even when faced with being interviewed during federal criminal investigations, the code of silence wins out. FOP members will maintain the code of silence because it is the omerta. They know that the criminal elements within the unions will put them in serious danger if they don't go along with the program (the omerta/code of silence ) and sadly, the U.S. Attorney has not come up with a way to protect the good officer that simply doesn't want to be a part of a union infested by criminals that obstruct justice and force them to do so as well.

304. Forcing the good officers to go along with the omerta/code of silence also puts plaintiff and other citizens in danger. Those that even consider breaking the code of silence let alone those that do, are likely to loose their job, loose their home under mysterious conditions, their family could be recruited to go against them, they could loose their car, be faced with all types of mysterious harms where the police draw back protection.

81

305. They could be put in physical danger by FOP and supporting union members who will use city resources while pretending to be doing something legitimate to participate in a pattern of felonious stalking state by state via the highways, byways and skyways, confidential information will be illegally obtained from the targets phones, computers and law enforcement and or other protected sources and then that confidential information unlawfully obtained will be disseminated.

306. The targets efforts to file a civil suit against the criminal elements can be and will be met with a huge pattern of fear tactics state to state to send a message that it's not too healthy to sue the FOP criminal elements, let alone file a complaint via any computer with the Criminal Division of the DOJ. These same violations are applied to private parties that report the criminal elements. It happened to plaintiff too.

307. Their homes will be broken into, third parties at various businesses they frequent will turn against them or be hostile towards them and they can and will face total isolation from those that use to be cordial and or friendly to them at work and or outside work simply because they try to be a good cop, they will be forced to leave their job only to be unable to find another job doing what they want or have to work a lower paying job, they can be forced into homelessness where they will be forced to live among individuals who are drug addicts, prostitutes for the police and firemen, ex-felons, rehabilitating addicts.

308. The target ( the good officer ) will be labeled a "snitch" they will taunted by anyone the criminal elements recruit to run with a verbal theme that he/she has " a death wish" or they are " going to be robbed" ( after the civil suit ). These same things happen to private parties that report the criminal elements. It happened to plaintiff too.

82

309.   Through it all, there will be nobody there to protect the good cop who did it all just because he couldn't conform to what the FOP leadership is breeding and the voice and face of the police "widow" is authorizing all in the name of her husband because they want to get even at any expense even if it means the criminal elements employing violent and criminal acts putting the target in fear of physical and economic harm and violating the publics' trust.

310. The FOP has a slew of lawyers to go to bat for the criminal elements they welcome into the unions. They hire these lawyers to keep the criminal elements employed, to keep the membership coffers full, to continue to breed the code of silence and make sure doing so is covered up and to keep generating funds for Faulkner's organization and the FOP by using the Danny Faulkner murder as their focal point because the case generates such sympathy when the FOP spins the facts while leaving out the fact that racketeering some of the very officers involved in the murder investigation participating in racketeering on a large scale at the time in question and were soon after the Mumia conviction imprisoned.

311. Furthermore, the defendants also agreed to conspire with the City of Philadelphia to cover-up the code of silence involving the Philadelphia FOP members. The City helps to foot the legal bill of the slew of criminal elements that have infested the FOP Philadelphia lodge. The City has increased it payment to the  FOP Legal Services fund by $2.00 per member ( Effective 7/1/09 – Arbitration Opinion and Award City of Philadelphia and Philadelphia FOP. )

312. Helping to foot the legal bill for the criminal elements gives them the impression that the City along with the defendants endorse and otherwise authorize the code of silence and that they will be protected for adhering to the omerta/code of silence. It is also this custom that resulted in plaintiff being violated.

313. Philadelphia FOP criminal elements include but are not limited to an officer that is alleged to have beaten his girlfriend with a closed fist and then left her a voicemail message "I'll stomp your fucking heart out", an officer who pointed a loaded Glock at a kid who changed the radio station in his truck at the police academy, an officer who forced a suspect to perform oral sex on him in his police cruiser ( Philly.com by William Bender posted 5/4/12.)

314. Officer Gerald Gibson allegedly stole money from a bait car ( CBS Philly 8/13/13 ), Officer Jonathan Garcia and Sydemy Jonais charged with setting up and robbing drug dealers and Garcia also charged with dealing heroin while in uniform out of his car, Officer Jeffrey Walker charged with planting drugs on a drug dealer, stealing his house keys and robbing his house of $15,000, Officer Gary Cottrell involved in insurance fraud ( 2/13/12 CBS Philly by Tony Hanson, Sean Alivera and Christopher Luciano sentenced to prison for conspiring with drug dealers to set up another drug dealer who was actually an undercover agent ( CBS Philly 6/15/11 by Tony Hanson ).

315. The Philadelphia police department avoided a DOJ suit in 1997 due to the corruption by agreeing to make the reforms requested. Ramsey has a lot of baggage during his reign in Chicago.

316. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, taunting, fear, and anxiety. Plaintiff requests $365,000 Thousand Dollars ( Three Hundred Sixty Five Thousand Dollars ) compensatory damages, $ 3 Million Dollars ( Three Million Dollars ) punitive damages, costs

Negligence

Defendants Shuttlesworth, Pat Massengill

317. Plaintiff re-states paragraphs 1- 316 as though fully stated herein.

84

318. Defendants Shuttlesworth and Massengill conspired with their co-defendants and the (non-party) co-conspirators to negligently cause harm to plaintiff to further the conspiracy.

319. Defendants Shuttlesworth and Massengill had a legal duty to use due care, they breached that duty and that breach was a proximate cause and or a legal cause of the damages to plaintiff.

320. Defendant Shuttlesworth knew full well that plaintiff couldn't afford for any of her events to go wrong. When one event went wrong, it would affect all the others. Defendant Shuttlesworth and co-defendants and (non-party) co-conspirators knew that the Birmingham City Council scheme would result in creating the havoc between the two of them they'd been seeking but had failed at previously as alleged throughout this complaint. It is this discussion that all the conspirators were seeking because in that cool, calm and collective discussion, the legal issues about the damages would be mentioned and that would give defendant Shuttlesworth and the co-conspirators just what they needed to bring in the state actors to attempt to obtain that arrest they'd been looking for and it would end any connection between plaintiff and Shuttlesworth. It would keep plaintiff away from the funeral just as the conspirators had planned.

321. Defendant Shuttlesworth knew that plaintiff was in a very fragile spot and had been crying while in Birmingham at her home so, participating Shuttlesworth's participation in a conspiracy to harm plaintiff would result plaintiff feeling very betrayed.

322. Defendant Massengill knew that carrying out her role in the conspiracy to be the impetus for the City Council Media Blitz scheme would result in plaintiff being harmed. Massengill knew it would create havoc between her step-mother and plaintiff which was the purpose of the scheme. Masengill knew about plaintiff's events/projects just as her step-mother, the co-conspirator defendants and the (non-party) co-defendants.

323. Massengill above all knew that she had zero financial power of Attorney about anything relative to finances for Rev. Shuttlesworth and that she'd been made aware of that fact as early as 1/08 just as defendant Shuttlesworth, her Attorney and Massengill's attorney were. That little tidbit was in the legal documents defendant Shuttlesworth later claimed that plaintiff had possibly stolen.

324. Massengill further knew that her father had lost most of his life savings ( over $500,000 ) when he was sued civilly and that most of the real estate property he had was in foreclosure and that the IRS was knocking very hard at his door and she knew she had absolutely no say so as to defendant Shuttlesworth's foundation. These are facts that Massengill, the co-conspirator defendants and (non-party) co-conspirators wanted to make sure the public didn't know so, they left those important facts out of their Birmingham City Council Media blitz scheme in order to further the conspiracy against to make sure the havoc between plaintiff and defendant Shuttlesworth took place.

325. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, anxiety of being subjected to the taunting, retaliation and being targeted by the conspiracy. Plaintiff request $365,000 ( Three Hundred Sixty Five Thousand ) in compensatory damages, costs and interests jointly and severally against all defendants.

## CONSPIRACY TO INTENIONALLY INTERFERE WITH CONTRACTS AND PROSPECTIVE CONTRACTAL RELATIONSHIPS

( Defendant Shuttlesworth, co-conspirator defendants and (non-party) co-conspirators

326. Plaintiff re-states paragraphs 1-325 as though fully stated herein.

327. Defendant Shuttlesworth conspired with the co-defendants and (non-party ) co-conspirators to interfere with plaintiff's prospective contractual relationships and contracts to further the conspiracy. Defendant Shuttlesworth, the co-defendant conspirators and (non-party ) co-conspirators knew plaintiff had prospective contracts and contracts for her festival, her concert The Musical Tribute, her audiobooks, the MLK Assassination Panel discussions and housing in Los Angeles. Defendant Shuttlesworth had seen the in-kind sponsorship for the festival and seen the venue it was to be held at, seen the marketing materials for the MLK audiobook had seen the venue for the Cleveland concert, knew plaintiff had media and hotel partners and Shuttlesworth was aware that plaintiff was getting talent on board to perform at the concert.

328. Defendants Shuttlesworth and the co-defendants and (non-party ) co-conspirators also knew about plaintiff's prospective contracts for her new Civil Rights organization as plaintiff had discussed with defendant Shuttlesworth naming the civil rights organization after Rev. Shuttlesworth.

329. Defendant Shuttlesworth knew full well that plaintiff spent a whole lot of time in her home on the phone and or computer working on all of her projects as the defendants conspiracy had resulted in plaintiff having to constantly try to get around their conspiracy so she could try to make a living doing what she wanted to do as a Special Events Planner. Plaintiff had no idea that defendant Shuttlesworth was working hand in hand with the co-defendants to set plaintiff up until her visit to Birmingham.

330. Shuttlesworth would even ask plaintiff to connect her with her contacts so she could make use of them for herself.

331. Defendant Shuttlesworth joined the conspiracy with her co-defendants and the (non-party) co-conspirators to intentionally interfere with plaintiff's prospective contracts and her contracts to further the conspiracy.

87

332. There was no legal justification for defendant Shuttlesworth to falsely accuse plaintiff of possibly stealing legal documents from her in an effort to obtain an arrest to attempt to extort plaintiff of her freedom and plaintiff's copies of the legal documents , there was no legal justification for any of the defendants to participate in a conspiracy to attempt to entrap plaintiff to cause an arrest, there was no legal justification for Shuttlesworth to encourage plaintiff to sue her step children only for her to later claim in front of police office D. Carter she didn't know plaintiff was going to do so absent Shuttlesworth and the co-defendants and (non-party ) co-conspirators furthering the conspiracy.

333. Defendant Shuttlesworth encouraged plaintiff to sue her step-children and knew full well that the legal documents she took plaintiff to make copies of so plaintiff would have her own copy, were being used for plaintiff to sue her step children. Plaintiff even has an email that she knew and encouraged it.

334. There was no legal justification for defendant Shuttlesworth to participate in a Media Blitz scheme with the co-defendants and (non-party) co-conspirators where the intent of the scheme was to cause plaintiff to have a conversation with defendant Shuttlesworth about the damage it would cause for her business projects and the legal ramifications that could be associated with the harm absent Shuttlesworth, the co-defendants and (non-party) co-conspirators furthering the conspiracy. Plaintiff's financial losses in prospective contracts exceed $200,000 ( Two Hundred Thousand dollars)

335. Plaintiff suffered mental anguish, humiliation, anger, embarrassment, frustration, fear, anxiety of being subjected to the taunting, retaliation and being targeted by the conspiracy. Plaintiff request $365,000 ( Three Hundred Sixty Five Thousand ) in compensatory damages, costs and interests jointly and severally against all defendants

Nora Fanar

I declare under penalty of perjury that the foregoing is true and correct.

88

Nona Farrar
P.O. BX 5015
Phgo, I1 60680  nonafarrar at hotmail.com